**HEADWATERS, an Oregon non-profit corporation, Plaintiff,**

v.

**Harv FORSGREN, in his official capacity as Regional Forester of the Pacific Northwest Region of the USDA Forest Service, and USDA Forest Service, an agency of the United States Department of Agriculture, Defendants,**

and

**Scott Timber Co., an Oregon corporation, and Columbia Helicopters, Inc., an Oregon corporation, Defendant–Intervenors.**

No. CV 01–1505–RE.

United States District Court, D. Oregon.

July 12, 2002.

Stephanie M. Parent, Pacific Environmental Advocacy Center, Portland, OR, for Plaintiff.

Michael Mosman, United States Attorney, Jeffrey K. Handy, Asst. U.S. Attorney, Portland, OR, Thomas L. Sansonetti, Asst. Attorney General, John P. Almeida, Trial Attorney, U.S. Dept. of Justice, Washington, DC, for Defendants.

Michael E. Haglund, Scott W. Horngren, Portland, OR, for Defendant–Intervenors.

## OPINION AND ORDER

REDDEN, District Judge.

The matters before the court are the plaintiff's and defendant's cross-motions for summary judgment (docs. 57 and 70, respectively) and plaintiff's motion to strike extra-record declarations. (doc. 77).

### *BACKGROUND*

On September 30, 1998, following the completion of an Environmental Assessment (EA), defendants (collectively, the Forest Service) issued a Finding of No Significant Impact (FONSI) and Decision Notice (DN) implementing the Peak Timber Sale in the Rogue River National Forest (the Peak Sale). The sale involves the harvesting, by thinning and group selection, of 270 acres of cut trees within an area of 660 acres, including 5 acres within a riparian reserve. The harvested logs will be removed by helicopter, using existing landing areas and roads.

In the EA, the Forest Service looked at three possible alternative actions:

1. Do nothing and reject the Peak Sale;
2. Implement the Peak Sale, including harvesting in the riparian reserve; or
3. Implement the Peak Sale, excluding harvesting in the riparian reserve.

The Forest Service's DN selected alternative 2, implementing the sale in its entirety. The Forest Service asserts that the impetus for implementing the Peak Sale was the need to thin shade-tolerant tree stands which, because of successful fire suppression efforts over the last century, have propagated at the expense of shade-intolerant tree stands.

Defendant-intervenors (collectively, Scott) assert that the Peak Sale replaces a previous timber sale awarded to Scott that was cancelled because of the threat to endangered species known to be nesting in the subject timber sale areas.

Plaintiff (Headwaters) has members who regularly use and enjoy the area encompassed by the Peak Sale. It participated in the EA process, and upon the issuance of the DN implementing the Peak Sale, filed a timely notice of appeal challenging the DN. The Forest Service denied the appeal and this action followed.

Headwaters contends that the Forest Service's decision to proceed with the Peak Sale violates the procedural and substantive requirements of the National Forest

Management Act, 16 U.S.C. § 1600 *et seq.* (Forest Act) and the procedural requirements of the National Environmental Protection Act, 42 U.S.C. § 4321 *et seq.* (NEPA).

Headwaters also moves to strike extra-record declarations offered by the Forest Service and Scott.

For the reasons discussed below, I (1) grant Headwaters' motion to strike extra-record declarations offered by the Forest Service and Scott; (2) grant the Forest Service's motion for summary judgment; and (3) deny Headwaters' motion for summary judgment. Further, *sua sponte,* I strike the extra-record declarations offered by Headwaters.

### SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). As here, where the court is reviewing the record from Administrative Procedure Act proceedings, summary judgment is appropriate for deciding the legal issue of whether the agency could reasonably have found the facts as it did. *Occidental Engineering Co. v. Immigration and Naturalization Service,* 753 F.2d 766, 770 (9th Cir.1985).

### STANDARD OF REVIEW OF AGENCY ACTIONS

If the court determines that the agency could reasonably have found the facts as it did, the court reviews the agency action to determine whether it is arbitrary and capricious. The court may not substitute its judgment for that of the agency decision maker, but must consider whether the decision was based on the relevant factors and whether there was a clear error of judgment. *Marsh v.Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The

agency action may not be set aside unless there was no rational basis for it. *Friends of the Earth v. Hintz,* 800 F.2d 822, 831 (9th Cir.1986).

### HEADWATERS' MOTION TO STRIKE EXTRA–RECORD DECLARATIONS

Headwaters moves to strike the declarations of Joel King and Michael Zan, submitted on behalf of the Forest Service, and the declaration of Jack Shoemaker, submitted on behalf of Scott. Headwaters also submitted declarations of Dylan Ruedigger and Derek Volkart in support of its motion.

■ Judicial review of a final agency action should be based on the administrative record created when the final agency action decision was made. Consideration of "extra-record materials" has been allowed in limited circumstances: (1) to determine whether the agency has considered all relevant factors and has explained its decision; (2) when the agency has relied upon documents not in the record; or (3) when necessary to explain technical terms or complex subject matter. *Southwest Center v. U.S. Forest Service,* 100 F.3d 1443, 1450 (9th Cir.1996). Post-decision declarations offered to either justify or attack an agency decision already made should not be considered. *Id.*

None of the declarations, including those submitted by Headwaters, fall within the above exceptions. Each is offered for the purpose of justifying or attacking the decision already made, based upon the record already established. All of the declarations are stricken.

### CROSS–MOTIONS FOR SUMMARY JUDGMENT

The cross-motions for summary judgment raise three issues: (1) did Headwaters exhaust all administrative remedies; (2) did the Forest Service violate the For-

est Act in implementing the Peak Sale; and (3) did the Forest Service violate NEPA in implementing the Peak Sale.

**1. Exhaustion of Administrative Remedies.**

■ Exhaustion of administrative remedies is a jurisdictional prerequisite to judicial review of the Forest Service's final agency action implementing the Peak Sale. *Gallo Cattle Co. v. U.S. Dept. of Agriculture*, 159 F.3d 1194, 1197 (9th Cir.1998). On this judicial review, Headwaters has raised issues regarding the effect of the Peak Sale on red-legged frogs and gray wolves, as well as the cumulative environmental impacts of the sale. Headwaters acknowledges that it did not address the red-legged frog in its appeal of the DN, nor is the impact on the gray wolf addressed in the appeal. Reference is made in the appeal to the cumulative impacts of the sale.

Headwaters did not exhaust its administrative remedies with regard to issues relating to the red-legged frog and gray wolf, and I do not consider those issues here. Rather, I consider issues relating to the cumulative impacts of the sale.

**2. Violation of the Forest Act.**

■ The Forest Act imposes procedural and substantive requirements on the Forest Service in the development of Land and Resource Management Plans to manage national forests. The Forest Act contemplates a two stage approach to forest planning. The first is the approval of a forest plan, following a comprehensive environmental impact study. The forest plan is to establish basic guidelines and set forth the planning elements that will be employed by the Forest Service in future site-specific decisions. *Sierra Club v. Robertson*, 28 F.3d 753, 755 (8th Cir.1994). Upon approval of the Forest Plan, the second stage is the assessment and implementation of site-specific projects, which must be consistent with the Forest Plan. *Inland Empire Public Lands v. United States Forest Service*, 88 F.3d 754, 757 (9th Cir.1996).

At issue here is whether the site-specific project, the Peak Sale, is consistent with the applicable Rogue River National Forest Plan, as amended by the Northwest Forest Plan 1994 (Forest Plan). Headwaters contends that the Peak Sale is inconsistent with the Forest Act and the Forest Plan in the following three particulars.

**(a) The Forest Service did not consider factors relevant to diversity of species.**

■ The Forest Act and the Forest Plan promulgated under it require the Forest Service to provide for diversity of animal species in order to maintain viable populations in the planning area. *Inland Empire, Id.* at 759.

Headwaters contends that the Forest Service failed to consider relevant factors relating to the viability of the Pacific Fisher, a small carnivore that lives in forest habitats, including the area of the Peak Sale. The Forest Service, however, did consider the fisher during the EA process. The Forest Service acknowledged that there was a lack of information on "the effect of management activities on the quality and quantity of sensitive species habitats [including the fisher]" in the sale area. AR 1400. The Forest Service biologist advised that "[m]any stands within the Peak Planning Area are lacking in coarse woody debris due to stand replacing fires which occurred approximately 80–120 years ago." AR 1261. An earlier study showed that the fisher made extensive use of downed woody materials for denning and resting. AR 874. The Forest Service concluded that the Peak Sale would increase woody material in the harvest area,

and would thereby benefit the fisher population. AR 1400.

Based on the record before me, I find that the Forest Service had a rational basis for the above conclusion and there was no clear error of judgment.

**(b) The Forest Service did not demonstrate that the Peak Sale is consistent with the Forest Plan standard for soils.**

■ The Forest Plan requires that no more than 10% of the area should be compacted following the completion of a project, and no more than 20% of the area should be compacted as a result of cumulative activities. Forest Plan at 4–247.

Headwaters contends that there was no reference in the administrative record reflecting specific compliance with the above soil standards. Accordingly, it is Headwaters' position that the Forest Service cannot demonstrate consistency with the Forest Plan, thereby rendering the decision arbitrary and capricious.

The Forest Service and Scott assert that the Forest Service did consider the impact of the Peak Sale on soil compaction. The reports from the soil scientist and hydrologist in the record conclude that the removal of the harvested logs by helicopter, using existing roads and landings, would mitigate against further soil compaction and have a minimal to no adverse effect to the soil resource. AR 1297–8; 1736.

I find that the record reflects that soil compaction was of concern to the Forest Service, and that the decision to use helicopter rather than tractor removal and to use existing roads and landings mitigated those concerns. While explicit reference is not made in the record to compliance with the specific standards for soil compaction in the Forest Plan, the Forest Service's conclusion has a rational basis in fact. The record does not support a conclusion

that the soil scientist and hydrologist made errors of judgment in their reports on soil compaction. The DN further asserts that the Peak sale is consistent with the Forest Plan. That finding implicitly included a finding that the soil compaction requirements were consistent with the Forest Plan, and is not inconsistent with the record. Therefore, I conclude that the Forest Service had a rational basis for the finding and that there was no clear error of judgment.

**(c) The Forest Service did not demonstrate that the Peak Sale meets or does not prevent attainment of the Forest Plan's Aquatic Conservation Strategy (ACS) objectives.**

■ The Peak Sale includes the harvesting of trees within 5 acres of riparian reserves, using silvi-cultural (thinning) methods. The trees to be harvested are within the outer 30–50 feet of the reserve boundary. The Forest Plan does not prohibit harvesting in that area of the riparian reserves if the Forest Service demonstrates that the harvesting will meet or not retard attainment of the ACS objectives, including maintaining "the existing condition or mov[ing] it within the range of natural variability." AR 608, B–10.

Headwaters contends that the Forest Service failed to evaluate the range of natural variability within the riparian reserve, thereby rendering its decision to allow harvesting in the riparian reserve arbitrary and capricious.

The Forest Service asserts that the silvicultural harvesting methods to be used to harvest trees on the outer edges of the riparian reserve are designed to encourage the natural regeneration of ponderosa pines by restoring conditions that will allow it. Such regeneration has been forestalled because of the fire suppression efforts of the past century and the resulting

dominance of white fir in the Peak sale area. AR 1407; 1737. The Forest Service "is seeking to undo the unnatural results of fire suppression, which necessarily will move the forest toward the range of natural variability." Def. Memorandum at 27.

Headwaters disagrees with the Forest Service's analysis of the effects of fire suppression. The record, however, is sufficient to support the Forest Service analysis. AR 612 at Appendix N–2 to 6; AR 1737. This court may not substitute its judgment for that of the agency. There is a sufficient record for a reasonable conclusion that historical fire suppression efforts have unnaturally affected conditions in the riparian reserve. I find that there is a rational basis to conclude that the type of harvesting to be done in the reserve will move it within the range of natural variability, and that there has been no clear error of judgment.

### 3. *Violation of NEPA.*

▇ NEPA mandates the procedures by which agencies must consider the environmental impacts of their actions. Its goals are: (1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to the public. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349–350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

▇ Federal agencies, such as the Forest Service, are required to prepare Environmental Impact Statements (EIS) for proposed "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency, as the Forest Service did here, may prepare an EA to determine whether the proposed action significantly affects the environment, thereby requiring the preparation of an EIS. 40 C.F.R. § 1501.4(a), 1508.9(a). An EA is a "rough-

cut, low budget environmental impact statement designed to show whether a full-fledged environmental impact statement ... is necessary." *Cronin v. U.S. Dept. of Agriculture,* 919 F.2d 439, 443 (7th Cir. 1990). The Council of Environmental Quality (CEQ), created by NEPA to provide guidance for agency compliance with NEPA requirements, has promulgated regulations allowing agencies to tier their environmental analysis from programs of broad scope (*e.g.,* Forest Plans) to site-specific projects of narrow scope (*e.g.,* timber sales) in order to eliminate repetitive discussions of the same issues. The site-specific analysis may incorporate the provisions of the broader analysis. 40 C.F.R. § 1508.28(a); 1500.4(i); 1502.20. *See also Oregon Natural Resources Council v. Lyng,* 882 F.2d 1417, 1422–24 (9th Cir. 1989).

The Forest Service conducted an EA, which resulted in the FONSI, thereby precluding the preparation of an EIS. The EA procedure followed by the Forest Service used the tiering approach recommended by CEQ regulations, *i.e.,* incorporating the environmental studies undertaken before implementing the Forest Plan with the specific studies undertaken in assessing the Peak Sale. The Forest Service gave adequate notice and a full opportunity for interested parties, including the public to comment and be heard on the scope of the assessment and its findings. Headwaters had, and did avail itself of, the opportunity to comment.

Headwaters contends here that the Forest Service violated NEPA in the following four particulars.

(a) **The Forest Service action in pre-marking trees for harvesting before completion of the EA and DN violates NEPA.**

▇ The Forest Service pre-marked, by painting, trees selected for harvesting

in the Peak Sale area before the EA was completed and the DN issued. Headwaters contends that the pre-marking demonstrated the Forest Service's pre-disposition to the sale, and resulted in the committing of resources prejudicing the selection of other alternatives to the one finally implemented. During oral argument, Headwaters also contended that the pre-marking resulted in damage to its members' aesthetic enjoyment of unpainted trees.

A federal agency should not take any action before the completion of an EA that would have an adverse environmental impact or limit the choice of reasonable alternatives. 40 C.F.R. § 1506.1. The record does not show, however, that by pre-marking the trees, the Forest Service made such an "irreversible and irretrievable commitment of resources" before conducting the EA to effectively foreclose other alternative actions. *See Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1063 (9th Cir.1998). Furthermore, while placing paint marks on trees may be aesthetically displeasing to Headwaters' members, I do not find that the paint marks constitute the type of adverse environmental impacts sufficient to constitute a violation of NEPA. I conclude that the pre-marking of the trees before the completion of the EA did not violate NEPA.

**(b) The Forest violated NEPA by failing to take a hard look at the environmental impacts of the Peak sale.**

■ To comply with NEPA, the Forest Service was required to take a "hard look" at the environmental impacts and consequences of its actions. *Oregon Natural Resources Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997). Headwaters contends that the requisite "hard look" was not made with regard to impacts of the Peak Sale on wildlife, soils, hydrology, and geology.

As noted above, an EA is not intended to be as thorough as an EIS. In the Peak Sale EA, the Forest Service relied upon previous studies used to formulate the Forest Plan, as well as specific studies relating to the Peak Sale area. Headwaters essentially repeats its contention that the Forest Service failed to consider all relevant factors with regard to wildlife, soils, and hydrology.

For all of the reasons set forth above with regard to Headwaters' contentions under the Forest Act, I conclude that the procedures used by the Forest Service in conducting the EA were sufficient to assure the "hard look" required by NEPA. There was full disclosure and opportunity for public input during the course of the EA. I conclude that the issuance of the FONSI, thereby precluding the preparation of an EIS, was rational based upon the record before me, and was not a clear error of judgment.

**(c) The Forest Service violated NEPA because it failed to consider adequately cumulative effects.**

■ NEPA requires the Forest Service to consider the cumulative impacts of the Peak Sale along with other past, present, and reasonably foreseeable future impacts from other activities. 40 C.F.R. § 1508.25(c). Headwaters contends that the Forest Service did not define adequately the geographic scope of its cumulative impacts study in considering the impact of future harvesting activities within the Brown watershed, the area of the Peak Sale, specifically with regard to the northern spotted owl and the fisher. There are, however, no contemplated future sales from which the Forest Service could determine a cumulative impact on those animals. The only potential future sale, the Flat Timber Sale, was withdrawn before the issuance of the issuance of the DN.

Exhibit C to Def. Memorandum. Any other future sale is speculative, and need not be evaluated for possible future cumulative impacts. *Headwaters v. Bureau of Land Management,* 914 F.2d 1174, 1181–82 (9th Cir.1990).

As discussed above, the Forest Service considered the impact of the Peak Sale on the fisher. There is no evidence of a significant impact from the Peak Sale on the northern spotted owl.

I conclude that the Forest Service's cumulative impacts analysis was adequate and there was no clear error of judgment in issuing the FONSI in that regard.

**(d) The Forest Service violated NEPA because it failed to prepare an EIS.**

 Headwaters contends that the Forest Service should have prepared an EIS because of the significant environmental impacts of the Peak Sale on wildlife, soils, and hydrology. Essentially, Headwaters incorporates all previous arguments and contends that the EA insufficiently addressed the environmental impacts, and that the FONSI and DN issued following the EA did not supply "a convincing statement of reasons" for not preparing an EIS. Pl. Memorandum at 32.

For the reasons stated above, I disagree. Based on the record before me, I conclude that the Forest Service had a rational basis for issuing the FONSI and the DN implementing the Peak Sale was not a clear error of judgment.

### CONCLUSION

For the reasons discussed above:

1. Headwaters' motion (doc. 77) to strike extra-record declarations offered by the Forest Service and Scott is GRANTED;

2. The Forest Service's motion (doc. 70) for summary judgment is GRANTED;

3. Headwaters' motion (doc. 57) for summary judgment is DENIED; and

4. *Sua sponte,* I strike the extra-record declarations offered by Headwaters.

IT IS SO ORDERED