**WILDWEST INSTITUTE and Friends of the Bitterroot, Plaintiffs,**

v.

**Dave BULL, Forest Supervisor for the Bitterroot National Forest; Abigail Kimbell, Regional Forester of Region One of the U.S. Forest Service; United States Forest Service, an agency of the U.S. Department of Agriculture State of Montana, Department of Fish, Wildlife & Parks, Defendants,**

**and**

**Bitterroot Resource Conservation and Development Area, Inc., Ravalli County, Sula Volunteer Fire Dept., Robert Wetzsteon, Becki Linderman, and Rocky Mountain Log Homes, Defendant–Intervenors.**

**No. CV 06–66–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

Dec. 22, 2006.

Thomas J. Woodbury, Forest Defense, Missoula, MT, for Plaintiffs.

Lori Caramanian, U.S. Department of Justice, Denver, CO, Victoria L. Francis, Office of the U.S. Attorney, Billings, MT, for Defendants.

George H. Corn, Office of the Ravalli County Attorney, Hamilton, MT, Julie A. Weis, Haglund Kelley Horngren Jones & Wilder, Portland, OR, for Defendant–Intervenors.

## ORDER

MOLLOY, Chief Judge.

### I. Introduction

Wildwest Institute and Friends of the Bitterroot challenge the United States Forest Service's approval of the Middle East Fork Project (the "Project"), a hazardous fuel reduction project on the Bitterroot National Forest ("BNF"). Plaintiffs raise claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq., and the Healthy Forest Restoration Act ("HFRA"), 16 U.S.C. §§ 6501 et seq. Before the Court are the Parties' cross-motions for summary judgment and Plaintiffs' motions to supplement the administrative record. For the reasons stated below, I find in favor of the Forest Service and the Intervenors and reject the claims of the Plaintiffs.

### II. Factual and Procedural Background

The Project was approved under the authority of the Healthy Forest Restoration Act of 2003. HFRA strives to, *inter alia,* "reduce wildfire risk to communities, municipal water supplies, and other at-risk Federal land through a collaborative process of planning, prioritizing, and implementing hazardous fuel reduction projects." 16 U.S.C. § 6501(1). It authorizes implementation of hazardous fuel reduction projects as soon as practicable on federal land in wildland-urban interface areas and federal land threatened by an epidemic of disease or insects. *Id.* § 6512(a)(1), (4). The 25,800 acre Project analysis area is located in Ravalli County,

two miles east of Sula, Montana. Ninety-one percent of the treatments included in the Project are in the wildland-urban interface. ROD at 5. Long-standing fire suppression and a boom in Douglas-fir bark beetle populations have created a high risk for intense fire in the Project area. The Project is designed to (1) reduce wildland fire threats to the Middle East Fork community, (2) restore fire-adapted ecosystems in the Middle East Fork landscape, and (3) restore stands affected by the Douglas-fir bark beetle epidemic by treating infested areas and lands at imminent risk of spread to promote healthy ecosystem function, composition, and structure. FEIS at 1–5.

The Forest Service analyzed three alternatives for the Project: a no action alternative (Alternative 1), the Forest Service's proposed alternative (Alternative 2), and an alternative proposed by Plaintiffs (Alternative 3). FEIS Summary at 7–14. Alternative 2 envisioned treatment on 6,472 acres to reduce fuels and change stand structure. FEIS Summary at 8–11. Alternative 3 proposed to reduce fuels only within a 400 meter radius of structures, for a total treatment area of 1,063 acres. FEIS Summary at 12–14. The Draft Environmental Impact Statement ("DEIS") was published on April 20, 2005. The Forest Service took public comments until June 13, 2005. The Final Environmental Impact Statement ("FEIS") was released on September 22, 2005, and the Record of Decision ("ROD") was issued in March 2006. The alternative selected in the ROD was a modified version of Alternative 2 ("Modified Alternative 2"). Modifications included (1) eliminating treatments in units containing old growth habitat; (2) dropping Project units with greater than 15% detrimental soil disturbance and units likely to have greater than 15% detrimental soil disturbance after proposed treatments; and (3) postponing a decision on treatment in units where further field review was necessary to determine whether past harvest had occurred. ROD at 11. These modifications were adopted in response to extensive public comment. ROD at 11. The selected Modified Alternative 2 will treat approximately 4,938 acres with approximately 2,893 acres of commercial logging. ROD at 4, 10.

After the ROD was issued, Plaintiffs brought suit challenging the Forest Service's approval of the Project. Plaintiffs' Complaint states seven claims for relief. First, Plaintiffs allege the Forest Service irretrievably committed resources by marking trees for harvest before reaching a final decision on the Project in violation of NEPA. Second, Plaintiffs claim the Forest Service failed to facilitate collaboration with the public in the decision-making process as required by NEPA and HFRA. Plaintiffs request that the Court remedy this violation by starting the HFRA process anew and requiring a specified number of public meetings. Third, Plaintiffs allege the Forest Service manipulated and/or failed to disclose the data and opinions of its own soils scientist, Ken McBride, in the FEIS in violation of NEPA. Fourth, Plaintiffs assert the Forest Service failed to properly monitor and analyze soil productivity in violation of NEPA and NFMA. Fifth, Plaintiffs claim the Forest Plan's minimum old growth requirement is not supported by best science and the Project does not meet old growth standards. Sixth, Plaintiffs allege Defendants Dave Bull and Abigail Kimbell abused their discretion while acting in a quasi-judicial capacity by adjudicating objections to the Project and then approving the Project. Plaintiffs request that the Court require the Project to be approved by a neutral arbitrator or a forest supervisor outside of Region 1 to remedy this violation. Finally, Plaintiffs claim the Pro-

ject will increase sedimentation in an already degraded watershed in violation of NFMA.

Plaintiffs moved to preliminary enjoin implementation of the Project on April 26, 2006. In seeking preliminary injunctive relief, Plaintiffs relied exclusively on their first three claims for relief (the "procedural claims"). This Court denied Plaintiffs' motion on June 30, 2006, concluding Plaintiffs had not met the requisite standard of demonstrating likelihood of success on the merits and irreparable harm. This Court's decision was affirmed by the Ninth Circuit on November 29, 2006.

Plaintiffs now move for summary judgment on the merits. In their opening brief, Plaintiffs merely mention their procedural claims. Plaintiffs state, "[a]s this court has already entertained and preliminarily rejected many of Wild West's procedural arguments, this brief will just summarize those arguments as necessary to preserve them for appeal...." Plfs.' Summary Judgment Brief, at 4. As discussed more fully below, however, a brief summary of Plaintiffs' procedural claims is insufficient to warrant review of those claims by this Court or on appeal. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1069 n. 18 (9th Cir.2000) (concluding failure to provide any legal argument in support of a contention waived the argument); Monetary II Ltd. P'ship v. I.R.S., 47 F.3d 342, 347 (9th Cir.1995) (noting "[a]s a general rule, an appellate court will not consider arguments which were not first raised before the district court, absent a showing of exceptional circumstances"). Review by this Court of a party's claims serves as more than merely a box to be checked off on the party's Notice of Appeal; it is designed to maximize the potential for ob-

taining correct results. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1154 (9th Cir.2000). As the Ninth Circuit has noted, our tiered system of federal courts "assumes that consideration of an issue at both the trial court and appellate court level is more likely to yield the correct result, because the issue will be more fully aired and analyzed by the parties, because more judges will consider it, and because trial judges often bring a perspective to an issue different from that of appellate judges." *Ecological Rights Found.*, 230 F.3d at 1154. Plaintiffs' failure to provide sufficient analysis and legal authority supporting their procedural claims precludes this Court from undertaking an initial analysis of, and providing its own unique perspective on, those claims. *See id.; cf. United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").[1] In my view, an already strained administrative process becomes nearly unworkable when claims or defenses are made that ignore the record and that provide little or no citation to it or to legal authority. It creates the appearance that all a disgruntled participant needs to do is go through the motions until it is time for appeal to the Circuit. The system Congress intended will falter, if not fail, if that is truly the way it works. I think not and in some respects this case shows why.

## III. Standards of Review

 Summary judgment is proper if "the pleadings, depositions, answers to in-

---

1. Although Plaintiffs did not adequately raise their procedural claims in their summary judgment briefing, Defendants and Defen-

dant–Intervenors provided argument, authority, and record citation regarding these claims in their motions for summary judgment.

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is a particularly appropriate tool for resolving claims challenging agency action. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir.1985). When a district court is reviewing the decision of an administrative agency, the administrative agency acts as the fact finder and the district court's role is limited to deciding the legal question of whether the agency could reasonably have found the facts as it did. *Id.*

■ Judicial review of an agency's compliance with NEPA and NFMA is governed by the judicial review provisions of the APA. *Ecology Ctr., Inc. v. Austin*, 430 F.3d 1057, 1062 (9th Cir.2005). A district court may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because agency action is presumed to be valid, the challenging party bears the burden of proving that the action violates § 706(2)(A). *Preston v. Heckler*, 734 F.2d 1359, 1372 (9th Cir.1984).

NFMA requires individual site-specific projects to comply with both the Forest Plan and NFMA's substantive requirements. *Ecology Ctr.*, 430 F.3d at 1062. NFMA's substantive requirements include: (1) "provid[ing] for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives," 16 U.S.C. § 1604(g)(3)(B); (2) "insur[ing] that timber will be harvested from National Forest System lands only where ... protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, block-ages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat," 16 U.S.C. § 1604(g)(3)(E)(iii); and (3) "insur[ing] that timber will be harvested from National Forest System lands only where ... soil, slope, or other watershed conditions will not be irreversibly damaged." 16 U.S.C. § 1604(g)(3)(E)(i).

■ NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") whenever they propose to undertake any "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The goal of NEPA is two-fold: to "ensure the agency will have detailed information on significant environmental impacts when it makes its decisions" and to "guarantee that this information will be available to [the public]." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir.1996). NEPA "does not mandate particular results, but simply describes the necessary process that an agency must follow in issuing an EIS." *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quotation omitted). In reviewing agency action under NEPA, a district court may not substitute its judgment for that of the agency. *Id.* Rather, "[i]ts focus must be on ensuring [the agency] took a 'hard look' at the environmental consequences of [its] decision[ ]." *Id.* A district court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one." *Id.* (quotation omitted).

## IV. Analysis

### A. Irretrievable Commitment of Resources

■ Plaintiffs claim the Forest Service violated NEPA by irretrievably committing $208,000 to mark trees in the Project area before a final decision had been made regarding Project alternatives. Plaintiffs provide only minimal argument and authority to support this claim in their summary judgment briefing. In particular, Plaintiffs opening brief states,

> When carrying out the NEPA decision-making process, the Forest Service may not "commit resources prejudicing selection of alternatives before making a final decision", and it must take a comprehensive "hard look" at environmental consequences that is both timely and taken "objectively and in good faith, not as a subterfuge designed to rationalize a decision already made." 40 C.F.R. § 1502.2(f); Metcalf v. Daley, 214 F.3d 1135, 1141–1142(9th Cir.2000)(emphasis added). WildWest maintains that the Forest Service subverted the decision-making process mandated by the NEPA as a subterfuge designed to rationalize a decision already made. In support of this argument, the record shows:
>
> . . . .
>
> the Forest Service irretrievably committed approximately $208,000 of a limited budget toward implementation of that pre-selected alternative during a time when they were supposed to be soliciting public input on the merits of the three alternatives, including a "community alternative" developed through extensive collaboration[.]

Plfs.' Summary Judgment Brief, at 5. This brief recitation of Plaintiffs' claim is not sufficient to properly raise the claim for purposes of summary judgment. Howard,

228 F.3d at 1069 n. 18; see also United States v. Lanzotti, 205 F.3d 951, 957 (7th Cir.2000) ("It is not this court's responsibility to research and construct the parties' arguments."). A litany of conclusions does not meet the mark of proposition, assertion, and argument tied to the record. In any event, even if Plaintiffs' brief conclusion about their irretrievable commitment of resources claim is sufficient to warrant review by this Court, the claim fails on the merits.

■ The comprehensive "hard look" that NEPA requires must be timely, objective, and taken in good faith and not merely to rationalize a pre-determined decision. Metcalf v. Daley, 214 F.3d 1135, 1141–42 (9th Cir.2000). Once the NEPA process has commenced, an agency may not take any action that would have an adverse environmental impact or limit the choice of reasonable alternatives until a final decision has been made regarding the proposal. 40 C.F.R. § 1506.1(a)(1)-(2). Agencies also may not "commit resources prejudicing the selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f). In the instant case, the Forest Service's expenditure of funds to mark trees did not prejudice their final decision because over 400 acres of timber marked for treatment were dropped from Alternative 2 in response to public comment before the modified version of the alternative was selected in the ROD. ROD at 11. See Headwaters v. Forsgren, 219 F.Supp.2d 1121, 1129 (D.Or.2002) (concluding pre-marking of trees before completion of Environmental Assessment did not foreclose other alternative actions).

■ Additionally, although not directly on point, cases discussing when the EIS process must be initiated also suggest the Forest Service's expenditure of funds

to mark trees did not violate NEPA.[2] An EIS is required at the point when a federal agency makes an "irreversible and irretrievable commitment of the availability of resources." *Friends of the Se.'s Future v. Morrison,* 153 F.3d 1059, 1063 (9th Cir. 1998). An irreversible and irretrievable commitment is made when the government fails to reserve the "absolute right to prevent the use of the resources in question." *Id.* In *Friends,* the court determined resources were not irretrievably committed when the government prepared a tentative operating schedule to plan for a long-term timber sale contract. *Id.* The court reasoned, the schedule "make[s] no commitment of any part of the national forests ... because the government retains absolute authority to decide whether any such activities will ever take place on the ... lands." *Id.* at 1063.

In contrast, in *Metcalf,* the court determined the government had made an irretrievable commitment of resources when it entered into a contract with an Indian tribe promising to represent the tribe in seeking approval from the International Whaling Commission for a gray whale quota. 214 F.3d at 1143–44. Accordingly, the court concluded the government's subsequent preparation of an Environmental Assessment analyzing the tribe's whaling proposal was untimely. *Id.* The "point of commitment" in *Metcalf* occurred when the United States entered into a contract that was not conditioned on a NEPA determination that the tribe's whaling proposal would not significantly affect the environment. *Id.* at 1143. According to the court, this contract "amounted to a surrender of the Government's right to prevent activity in the relevant area." *Id.* at 1144. *See also Conner v. Burford,* 848 F.2d 1441, 1447–49 (9th Cir.1988) (concluding oil and gas leases on national forest land that forbid the lessee from occupying or using the surface of the leased land did not constitute an irretrievable commitment, but lease that did not reserve to the government the absolute right to prevent all surface-disturbing activity required preparation of an EIS before it was entered into); *Envtl. Def. Fund, Inc. v. Andrus,* 596 F.2d 848, 852 (9th Cir.1979) (concluding irretrievable commitment of resources occurred when government entered into an option contract for the allocation of water, not when the option was exercised, because the government could not allocate the water to other uses during the period of the option).

Here, the Forest Service did not enter into any contracts for the sale or allocation of natural resources before a final decision was made regarding the Project. Although the Forest Service expended funds to mark trees, this expenditure did not bind the Forest Service to any third party. At all times before a final decision was made, the Forest Service retained complete authority to prevent salvage or treatment of the marked trees; the retention of this authority is exemplified by the fact that the Forest Service retained some marked trees in its selection of Modified Alternative 2. The Forest Service did not irretrievably commit resources before making a final decision regarding the Project.

## B. Collaboration with the Public

Plaintiffs' Complaint alleges the Forest Service failed to facilitate collaboration with the public in the decision-making process as required by NEPA and HFRA. Plaintiffs' summary judgment briefing does not address this contention except to state that the record shows

---

**2.** In the instant case, the trees were marked

during the NEPA process, not before it began.

members of the public were purposely excluded from public meetings, in one case by armed guards, based upon their perceived opposition to the pre-selected alternative, and the Forest Service failed to disclose the unusual level of public interest in the FEIS, all in an effort to create an illusion of public support for a pre-determined outcome.

Plfs.' Summary Judgment Brief, at 5. Once again, this brief recitation of Plaintiffs' claim is insufficient to warrant review of the claim by this Court. *See Howard,* 228 F.3d at 1069 n. 18. Even if Plaintiffs have adequately raised this claim, it is similarly without merit. As this Court noted in its June 30, 2006 Order denying preliminary injunctive relief, Defendants complied with the public collaboration requirements of NEPA and HFRA by holding several public meetings and responding to public comments and FOIA requests.

**C. Soils**

Plaintiffs raise both a procedural and a substantive soils claim. Plaintiffs' procedural claim alleges the Forest Service violated NEPA by failing to fully disclose and respond to the data and opinions of its own soils scientist, Ken McBride, in the FEIS. Plaintiffs' substantive soils claim alleges the Forest Service failed to properly analyze soil productivity before approving the Project in violation of NEPA and NFMA. In particular, Plaintiffs argue the Forest Service did not survey existing levels of detrimental soil disturbance on over 700 acres of commercial logging units included in the Project or adequately address the legacy of soil damage in the Project area resulting from past timber harvest.

▇▇▇ An agency is required to disclose and respond to evidence and opinions challenging the scientific basis upon which an EIS rests. *See Ctr. for Biological Diversity v. U.S. Forest Serv.,* 349 F.3d 1157,

1167 (9th Cir.2003). In the instant case, the FEIS adequately discloses and responds to McBride's evidence and opinions. The FEIS discusses differences in the methods used, and the results obtained, by McBride and the peer review group. FEIS at 3.5–2 to 3.5–3. *Compare* FEIS at 3.5–10 to 3.5–11 (indicating results of "Howes" method), *with* DEIS at 3.5–7 to 3.5–8 (showing results from "rapid" method). In particular, it explains that McBride's method, the "rapid" method, classifies disturbance as either satisfactory or detrimental, whereas the peer review groups's method, the "Howes" method, allows a scientist to determine the degree of soil disturbance and permits classification of soil as disturbed, but not detrimentally disturbed. FEIS at 3.5–2 to 3.5–3. Because the "Howes" method utilized by the peer review group is recommended for use on Region 1 forests, AR CD4 BACKGD–15, at 4, the Forest Service was not required to adopt McBride's methods or results. *See Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (noting "when specialists express conflicting views, an agency has discretion to rely on the reasonable opinions of its own qualified experts"); *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1244 (9th Cir.2005) (refusing to "take sides in a battle of the experts" when the method relied on by the Forest Service was reasonable (quotation omitted)). The Forest Service nevertheless utilized McBride's data in selecting a final Project alternative. Therefore, the Forest Service did not fail to disclose and respond to McBride's data and opinions in violation of NEPA.

▇▇▇ Plaintiffs' substantive soils claims are also unavailing. Plaintiffs contend the Forest Service failed to survey existing levels of detrimental soil disturbance on several hundred Project acres. Instead,

according to Plaintiffs, the Forest Service merely "guessed" at disturbance levels using aerial photographs and a database known as the Timber Stand Management Record System (TSMRS). The Project alternative adopted by the Forest Service, however, only treats units that were field surveyed by McBride, terraced, or where there is first-hand field knowledge by peer group members that no past harvest occurred. ROD at 21. All units in which detrimental soil disturbance would exceed 15% either before or after treatment were eliminated from the Project. ROD at 11, 21. Units where the determination of no past activity was based solely on aerial photographs were similarly eliminated. ROD at 21–22. Because the Project does not treat units that were not surveyed or units with uncertain levels of soil disturbance, the Forest Service's alleged failure to survey other units within the Project analysis area is not unlawful.

■ Plaintiffs also assert the FEIS omitted information contained in the DEIS regarding legacy soil disturbance. The FEIS contains a detailed list of past harvest activities in each Project unit and discusses the potential cumulative impacts of those activities and the proposed Project. FEIS at 3.5–33 to 3.5–47. Although this information is in a different form than that contained in the DEIS, it is sufficient to satisfy NEPA's requirement that the Forest Service take a "hard look" at soils.

**D. Old Growth**

Plaintiffs advance three arguments with respect to old growth. First, Plaintiffs contend the Forest Plan's minimum old growth requirement is not sufficient to sustain viable populations of old growth species. Second, Plaintiffs claim, even if the Forest Plan's minimum old growth standard is sufficient, the BNF does not meet that standard, and thus, the Forest

Service must designate replacement old growth. Finally, Plaintiffs claim the Forest Service did not support its decision to de-list several units of previously designated old growth habitat with raw data in the administrative record.

■ The Project is not an appropriate vehicle for Plaintiffs to challenge the Forest Plan's minimum old growth requirement. A Forest-wide management practice, like a Forest Plan's minimum old growth standard, cannot be challenged under the APA unless the practice renders a site-specific, project unlawful. *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1067 (9th Cir.2002). A plaintiff seeking to challenge a forest-wide management practice must demonstrate a relationship between the lawfulness of the challenged project and the forest-wide management practice. *Id.* at 1067–68. Plaintiffs cannot meet this burden with respect to the Forest Plan's minimum old growth requirement because the Project does not include treatment of any old growth habitat. ROD at 22; ROD at 11 (explaining Alternative 2 was modified to eliminate all treatment of old growth based on public comment).

■ Plaintiffs second claim, regarding the designation of replacement old growth, is properly before the Court. Fifteen out of twenty-four of the third-order drainages within the Project area do not currently meet Forest Plan standards for old growth habitat. FEIS at 3.6–8. Although the Project will not treat any old growth, Plaintiffs contend the Project must be designed so as not to harm any soon-to-be old growth. Plaintiffs are particularly concerned with the Project's intent to salvage some live, large trees (legacy trees). In arguing the Forest Service must designate and protect soon-to-be old growth, Plaintiffs rely on *Lands Council v. Vaught,* 198 F.Supp.2d 1211 (E.D.Wash.2002).

In *Lands Council*, the plaintiffs challenged a Forest Service project designed to address a Douglas-fir bark beetle outbreak in the Colville and Idaho Panhandle National Forests. *Id.* at 1219. Although the challenged project did not involve the logging of any old growth, the plaintiffs argued the Forest Service must demonstrate compliance with the Forest Plan's old growth standards and ensure that the mature trees logged under the project were not needed to fill any shortfall in the required old growth acreage. *Id.* at 1225. The court agreed. It noted, to comply with NFMA, a project must meet the Forest Plan's old growth standard. *Id.* The court determined the Forest Service could demonstrate compliance either by showing "adequate old growth acreage exist[ed] in the [relevant national forests] to satisfy the [Forest Plans'] old growth standards or that the timber slated to be harvested under the Project [was] not needed to fulfill old growth standards." *Id.* The court granted summary judgment to the plaintiffs because the Forest Service failed to demonstrate compliance with Forest Plan old growth standards or that trees being logged pursuant to the project were not needed as replacement old growth. *Id.*

The instant case is distinguishable from *Lands Council* because, here, the Forest Service has made reasonable efforts to protect trees that may someday contribute to old growth. In fact, the Project's treatments are designed to improve the potential for the development of future old growth by "improv[ing] the species composition of the stands and reduc[ing][the]

risk of losing the stands outright from stand replacing crown fires and insects and disease." ROD at 23; *see also* FEIS at 3.6–12 (citing studies that found treatment can insure retention of old growth characteristics). Treatments are also designed to retain large trees, *see, e.g.,* ROD at 32 (prohibiting cutting of live trees larger than 12 inches dbh in areas of noncommercial treatment); *id.* at 33 (requiring retention of the largest diameter classes in a stand in areas of intermediate commercial treatment); *id.* at 34 (limiting sanitation/salvage treatments to dead and dying trees); and mitigation measures integrated into the Project's design will help insure the protection of large trees. *See* ROD at 34; Attachment A, Section 2.[3] Because Plaintiffs offer no specific evidence or argument to refute the Forest Service's determination that the Project will encourage future development of old growth, this case is distinguishable from *Lands Council*, and Plaintiffs' claim fails.

█ Finally, Plaintiffs contend the administrative record does not contain adequate data to support the Forest Service's decision to de-list certain units of old growth habitat. NEPA requires that the public receive the underlying, hard data used by a Forest Service expert in deriving his or her opinion so that the expert's opinion may be challenged. *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir.1998). After the FEIS for the Project was issued, the Forest Service conducted field verification studies on several units within the Project area that were previously designated as old growth habitat. The studies concluded some of the

---

**3.** Plaintiffs appear to contend the removal of even a single large, living tree violates the law. HFRA, however, only requires that projects be carried out in a manner that "maximizes the retention of large trees, as appropriate for the forest type, to the extent that the trees promote fire-resilient stands." 16

U.S.C. § 6512(f)(1)(B). Although the Project will require the removal of some large, live trees, the ROD and FEIS explain how the removal of these trees is necessary to maintain and restore fire-resilient stands and facilitate treatment operations. ROD at 32–33 (containing citations to FEIS).

units no longer met the criteria for old growth habitat because of the death of large trees caused by Douglas-fir bark beetles. Plaintiffs complain the data supporting the de-listing of old growth habitat was not a part of the administrative record. Plaintiffs have moved to supplement the record with, or in the alternative for leave to file, the declaration of Cameron Naficy. According to the declaration, Naficy, a graduate student at the University of Montana, conducted a field survey of some of the de-listed units and determined the units likely have sufficient live trees at least 21 inches dbh to qualify as old growth.

Defendants oppose Plaintiffs' motion to supplement the record. They contend the data Plaintiffs seek is in the record. Defendants also argue Naficy's education and experience do not qualify him as an expert and his methodology is flawed. To critique Naficy's methodology, Defendants submitted the declaration of Sheryl Meekin. Meekin takes issue with Naficy's failure to identify the old growth forest type and habitat type of the units surveyed; failure to consider old growth criteria other than the existence of live, large trees; and utilization of an improper and unscientific method for determining whether a tree was live or dead.

■ The administrative record contains an explanation of the methodology used by the Forest Service in de-listing previously designated old growth and the raw data supporting the de-listings. *See* AR CD2 SILV–002, SILV–40, SILV–45, SILV–52, SILV–69. Plaintiffs, along with the rest of the public, were aware of the de-listing of old growth habitat by March 2006 when the ROD was issued. Plaintiffs have had access to the methodology and raw data on which the de-listings were based since at least May 2006 when the Forest Service designated the administrative record in this case. Even if Plaintiffs were unable to locate this data in the administrative record, Defendants' opening brief, which was filed on October 2, 2006, cited to the data in the administrative record. *See* Defs.' Summary Judgment Brief, at 13 n. 10. Plaintiffs nevertheless did not move to supplement the record with the Naficy declaration until November 2, 2006, more than fifteen days after summary judgment briefing was completed. Plaintiffs delay is inexcusable. Moreover, the Naficy declaration does not identify flaws in the methodology used by the Forest Service to determine the de-listed units no longer met old growth criteria. Nor does it question the accuracy of the raw data. Instead, Naficy utilized a different (and questionable) methodology to reach a different result. This Court will not entertain a "battle of the experts" where the methodology utilized by the Forest Service to de-list the relevant units was reasonable. *See Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993); *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. Moreover, because the administrative record contains data to support the Forest Service's decision to de-list old growth, Plaintiff's claim is without merit.

### E. Species Viability

■ Plaintiffs raise several claims with respect to maintaining old growth species viability. Plaintiffs generally assert the Forest Service does not monitor population trends of management indicator species ("MIS"), has failed to implement a scientifically defensible habitat proxy for MIS population trends, and refuses to consider the best available science for insuring old growth species viability in spite of the fact that such science undermines core assumptions of the Forest Plan. Plaintiffs, however, merely recite these generic claims and provide no explanation, legal

authority, or record citation to explain or support the claims. Importantly, Plaintiffs do not indicate what best available science they are referring to or which core assumptions of the Forest Plan are undermined by this science. Moreover, as Defendants correctly note, the regulations in effect when the Project was approved do not require population monitoring. The regulations provide,

> For units with plans developed, amended, or revised using the provisions of the planning rule in effect prior to November 9, 2000, the Responsible Official may comply with any obligations relating to management indicator species by considering data and analysis relating to habitat unless the plan specifically requires population monitoring or population surveys for the species. Site-specific monitoring or surveying of a proposed project or activity area is not required, but may be conducted at the discretion of the Responsible Official.

36 C.F.R. § 219.14(f). Because the Forest Plan does not require population monitoring of MIS, Plaintiffs claim that the Project is unlawful for failure to monitor population trends is without merit.

■ Plaintiffs provide more elaborate arguments with respect to their claims relating to specific, old growth species. Regarding the pileated woodpecker, for example, Plaintiffs argue the FEIS fails to recognize the pileated woodpecker's preference for larger trees and snags. The FEIS, however, acknowledges the pileated woodpecker's preference for large, dead trees and notes the Project will retain snags from the largest size classes available. FEIS at 3.6–43; *see also* FEIS at 3.6–43 (noting pileated woodpecker prefers snags greater than 21 inches dbh). Plaintiffs counter that "[t]he minimum size in this 'largest size class' is too small for pileated woodpecker nesting and roosting."

Plfs.' Response Brief, at 9. Nevertheless, Plaintiffs provide no support for this assertion either by referencing current BNF conditions or flaws in silvicultural prescriptions for a particular Project unit. *See* AR CD2 SILV–75 (containing detailed silvicultural prescriptions for each Project unit). Because Plaintiffs have not demonstrated the Forest Service failed to adequately analyze the Project's potential effects on pileated woodpeckers, their claim fails.

■ Plaintiffs also allege the Forest Service did not adequately analyze the Project's impacts on the viability of the northern goshawk. Goshawks prefer habitat with a dense overstory of large trees and an open understory of grass and shrubs. FEIS at 3.6–71. A survey of the Project area revealed two known and two potential active goshawk nest territories; two additional nest territories were located within a half mile of the Project area boundary. FEIS at 3.6–72. According to the FEIS, no treatment will occur within thirty acres of these nests. FEIS at 3.6–73. Moreover, if an active goshawk nest is subsequently found near an activity unit, project activity will be limited in time and location to protect the nest. FEIS at 3.6–73. Plaintiffs argue merely protecting goshawk nests is not a valid viability strategy; rather, Plaintiffs contend 20% to 50% of older forest must be maintained in goshawk territories to protect the species. Plaintiffs claim, by limiting protections to active nests, the FEIS fails to recognize the negative effects that thinning of older forests will have on goshawk habitat and goshawk prey densities.

The FEIS concluded the Project "may impact individual goshawks or their habitat, but would not likely contribute to a trend towards Federal listing or loss of viability to population of species." FEIS at 3.6–79. This assessment was based in part on monitoring that showed goshawk

nests were well distributed throughout the BNF. *See* FEIS at 3.6–79 (noting 2004 Draft Monitoring Report identified 75 goshawk nests across the BNF). The FEIS notes past fire suppression activities have increased goshawk habitat and timber harvests have likely decreased habitat. Nevertheless, according to the FEIS, the "Douglas-fir bark beetle epidemic has perhaps had the largest impact to goshawk habitat in the [Project area] in recent years," and the Project is designed to mitigate these impacts. FEIS at 3.6–78. Thus, although the Project may affect goshawk habitat, the Forest Service took the required "hard look" at the Project's potential effects on goshawks. *See, e.g.,* FEIS at 3.6–74 to 3.6–75 (noting potential and suitable goshawk habitat will be treated, but treatments are designed to retain live overstory stand component); *id.* (describing mitigation measures to retain adequate amounts of woody debris and snags for goshawk); *id.* at 3.6–75 to 3.6–76 (discussing Project's potential effects on goshawk prey).

Plaintiffs attempt to bolster their goshawk claims with extra-record material. After completion of summary judgment briefing, Plaintiffs moved to supplement the record with, or in the alternative for leave to file, the declaration of Dr. Sara Johnson. According to Plaintiffs, the declaration is in response to a March 8, 2006 Forest Service memorandum discussing potential impacts of the Project on the goshawk. *See* AR CD2 WILD–58. Plaintiffs claim, because the March 8, 2006 memorandum was prepared after completion of the FEIS, the public did not have the opportunity to respond to the memorandum. Plaintiffs assert the Johnson declaration is their response. The Johnson declaration opines that the Forest Service's conclusion that decreases in canopy cover in goshawk breeding habitat will not affect habitat quality is contrary to *Reyn-*

*olds, et al.,* which recommends a canopy cover of 60% or greater.

The March 8, 2006 Forest Service memorandum was prepared during the administrative review process to address objections raised by The Ecology Center to the FEIS. AR CD2 WILD–58. It merely explains information already contained in the FEIS. Specifically, the memorandum explains the Forest Service's use of research by Reynolds and Patla to estimate areas of goshawk nesting habitat and post-fledging habitat. AR CD2 WILD–58. Even if the Johnson declaration is admissible as extra-record material, *see Inland Empire Pub. Lands Council v. Glickman,* 88 F.3d 697, 703–04 (9th Cir.1996) (describing situations where extra-record material is permitted), Plaintiffs provide no explanation as to why they did not submit the declaration during summary judgment briefing. Plaintiffs' opening summary judgment brief in this case was filed on September 18, 2006, more than six months after the March 8, 2006 memorandum was drafted. Plaintiffs had ample opportunity to prepare and submit the declaration with their opening brief. Instead, Plaintiffs waited until after the Parties' summary judgment motions were fully briefed. This Court has previously rejected an attempt by Plaintiffs to supplement the record at the last minute in a another case. *See Native Ecosystems Council v. Kimbell,* CV 04–127–M–DWM (D. Mont. April 25, 2006) (granting motion to strike declarations filed after the completion of briefing, including a declaration by Dr. Johnson). The Court similarly rejects Plaintiffs' attempt here.

■ Plaintiffs' last species of concern is the black-backed woodpecker. Black-backed woodpeckers rely largely on forested habitats that contain high densities of recently dead or dying trees that have been colonized by bark beetles and wood-

borer beetles. FEIS at 3.6–80. The Project seeks, in part, to reduce the threat of intense wildfires that create this type of habitat. Plaintiffs argue the FEIS fails to disclose and discuss the negative effect the Project will have on the creation of black-backed woodpecker habitat in the future. Plaintiff's claim, however, is without merit. In its analysis of the effects of the Project on the black-backed woodpecker, the FEIS acknowledges that black-backed woodpeckers prefer areas of forest burned by moderate to severe fires. FEIS at 3.6–80. It notes Alternatives 1 and 3 might increase future black-backed woodpecker habitat because the proposals do not treat potential habitat, increasing the likelihood of future fires in the Project Area. FEIS at 3.6–81 to 3.6–83. Alternative 2, on the other hand, will reduce the likelihood of future moderate to high intensity fires and thus reduce the likelihood of future habitat creation. FEIS at 3.6–82. The FEIS nevertheless determines none of the Project alternatives would significantly impact black-backed woodpeckers because there is ample habitat adjacent to the Project area and there is minimal habitat currently in existence in the Project area. FEIS at 3.6 82 to 3.6–83 (noting only 1% of the Project area has experienced past moderate to high intensity fire). This analysis demonstrates the Forest Service took the requisite "hard look" at possible impacts to the black-backed woodpecker.

### F. Watershed Claims

The Project area is located along the East Fork of the Bitterroot River water-shed. FEIS at 3.3–2. The East Fork is on the Clean Water Act 303(d) list of water quality limited segments, and thus, proposed activities must demonstrate further degradation of the watershed will not occur. FEIS at 3.3–2 to 3.3–3. Roads currently contribute 151.2 tons of sediment per year to streams within the Project area. FEIS at 3.3–13. The FEIS acknowledges "[t]here [will] be an increase in risk of sediment contributions to streams from increases in traffic on roads and a low probability of sedimentation due to vegetation and fuel management."[4] FEIS at 3.3–26. Nevertheless, mitigation features integrated into the Project and the implementation of Best Management Practices ("BMPs") are designed to reduce possible sedimentation. FEIS at 3.3–26; id. at 3.3–27 to 3.3–30 (listing watershed improvement mitigation measures); id. at 2–46 to 2–54 (containing table of mitigation features). Moreover, any risk of sedimentation during project implementation is offset by future benefits of the Project. FEIS at 3.3–26. According to the Forest Service, the Project "will result in a long-term reduction of potential sediment contributions of approximately 35.7 tons annually."[5] ROD at 20 (emphasis omitted).

Plaintiffs argue the Forest Service has failed to adequately explain how logging is going to help restore a watershed that is already severely damaged ecologically from too much past logging. Plaintiffs question use of BMPs to reduce sedimentation, claiming BMPs have not been properly implemented in the past and are not

---

4. There is a 3% to 27% probability that 21 tons of sediment would be delivered to streams from vegetation management and prescribed burning over the life of the Project. ROD at 19. The risk of sedimentation due to the hauling of logs on roads that parallel streams is greater. ROD at 19.

5. Under the no action alternative, a future 1,000–acre fire of uncharacteristically severe intensity in the Middle East Fork area could increase sediment contributions to streams by between 100 and 6,000 tons. ROD at 21–22. After implementation of the Project, an identical fire would produce between 0 and 26 tons of sediment. ROD at 21–22.

effective. In support of this assertion, Plaintiffs cite a Project objection that indicates an expert from Pacific Rivers Council toured the Project area during rainy weather on June 2, 2005 and found

> roads that the DEIS says were recently upgraded to BMP standards delivering large quantities of road runoff and sediment directly to streams in the project area ... despite newly-"upgraded" road drainage features. Our field observations indicated both that existing ill-designed roads are fundamentally harmful by virtue of location and configuration, but also that recent "BMP upgrades" had not been applied with sufficient resources, precision, skill, and foresight to achieve the full measure of reduction in harm that might have been obtained from a credible road restoration project.

AR CD1 OBJECT–22, at 26. Plaintiffs also claim some of the Project's road rehabilitation work is not tied directly to project funds, and thus, the work might be delayed or omitted completely. Plaintiffs argue the Forest Service should not rely on these measures in determining that the Project will reduce sedimentation without noting the possibility of incomplete funding.

 The incorporation of mitigation measures into a proposed action and analysis of the effects of that proposed action with the mitigation measures in place supports an agency's "hard look" at environmental effects as required by NEPA. *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015–16 (9th Cir.2006). In *Environmental Protection Information Center*, the court determined the agency took a "hard look" at environmental consequences where an Environmental Assessment contained specific and detailed information about mitigation measures, analyzed environmental impacts with those measures in place, and provided for ongoing monitoring to ensure compliance with the mitigation measures. *Id.* Similarly, here, the Project contains detailed measures to mitigate steam sedimentation from Project implementation. *See* FEIS at 3.3–28 to 3.3–30; *see also id.* at 3.3–28 (explaining additional mitigation measures added to Project because of public comment on DEIS). Moreover, although the Forest Service does not point to evidence of extensive past monitoring of BMPs in the BNF,[6] the Project itself requires monitoring of BMP and watershed mitigation implementation and effectiveness. FEIS at Appendix C. The Forest Service consulted with the Environmental Protection Agency ("EPA") on the Project, and the EPA concluded the Project was consistent with the goal of the Bitterroot Headwaters Total Maximum Daily Load (TMDL) and the Water Quality Restoration Plan to restore full support for beneficial uses in the East Fork Bitterroot River in part due to the Project's mitigation measures and the feedback loop for assuring BMP and watershed restoration effectiveness. ROD at Attachment A–20. Because the Project is designed to reduce future sedimentation and contains appropriate mitigation measures and implementation controls, it is not contrary to law. *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1015–16.

 Plaintiffs also claim the mitigation measures designed into the Project might be delayed or might never be implemented because of insufficient funding. The ROD, however, indicates the Project's

---

**6.** The State of Montana undertakes BMP audits and the Forest Service conducts annual reviews to ensure accurate BMP implementation and effectiveness. The most recent BNF monitoring and evaluation report discusses a 2004 Montana DEQ Forestry BMP Audit that analyzed one timber sale in the BNF, the Blodgett Stewardship. AR CD3 FPMON–25, at 99. The audit found the project exceeded application and effectiveness BMP requirements with only one exception. AR CD3 FPMON–25, at 99.

mitigation measures are tied to stewardship funds and will be completed prior to contract closure. ROD at 20. The only exception is funds for culvert removal. ROD at 20. This exception was properly disclosed and discussed by the Forest Service. ROD at 20; *see also Inland Empire,* 88 F.3d at 758 (noting NEPA does not mandate particular results, but simply requires a district court to ensure the agency took a hard look at the environmental consequences of its decision). The ROD indicates failure to implement the culvert removal component of the Project would lessen the Project's potential long-term sediment reduction effects by 0.8 tons. ROD at 20. If culvert removal is not completed, the Project will still result in long-term reduction of potential sediment contributions of approximately 34.9 tons annually. Because the Forest Service adequately discussed the contingent nature of some Project funds and analyzed the effects of the Project absent those funds, Plaintiffs' claim fails.[7]

## V. Conclusion

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' motions to supplement the record with, or alternatively for leave to file, the Johnson and Naficy Declarations (dkt # 57, 58) are DENIED.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment (dkt # 45) is GRANTED with respect to each of Plaintiffs' claims. Defendant–Intervenors' motion for summary judgment (dkt # 47) is GRANTED with respect to each of Plaintiffs' claims. Plaintiffs' motion for summary judgment (dkt # 42) is DENIED.

---

7. Plaintiffs' briefing does not mention the Sixth Claim for Relief in their Complaint (abuse of discretion), and thus, the Court deems that claim abandoned.