# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILDWEST INSTITUTE;
FRIENDS OF THE BITTERROOT, INC.,
     *Plaintiffs-Appellants,*

v.

DAVE BULL; ABIGAIL KIMBELL;
UNITED STATES FOREST SERVICE,
     *Defendants-Appellees,*

BITTER ROOT RESOURCE
CONSERVATION AND DEVELOPMENT
AREA INC.; RAVALLI COUNTY; SULA
VOLUNTEER FIRE DEPARTMENT;
ROBERT WETZTSEON; BECKI
LINDERMAN; ROCKY MOUNTAIN LOG
HOMES,
     *Defendant-intervenors-Appellees.*

No. 07-35044

D.C. No.
CV-06-00066-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, Chief District Judge, Presiding

Argued December 12, 2007
Submission Vacated July 7, 2008
Resubmitted October 29, 2008
Pasadena, California

Filed November 6, 2008

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge O'Scannlain

15201

## COUNSEL

Thomas J. Woodbury, Forest Defense, P.C., Missoula, Montana, argued the cause for the plaintiffs-appellants and filed briefs.

Stacey Person, Environmental & Natural Resources Division, U.S. Dept. of Justice, Washington, DC, argued the cause for the federal defendant-appellees and filed briefs.

Julie Weis, Hagland Kelley Horngren Jones & Wilder LLP, Portland, Oregon, argued the cause for the defendant-interventor-appellees and filed briefs.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the United States Forest Service complied with federal environmental law in its management of the Bitterroot National Forest.

I

In order to effectuate its management role over the national forests, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, requires the United States Forest Service ("Forest Service") to develop and to maintain forest resource management plans. *Id.* § 1604(a). Such plans must, among other things, "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area." *Id.* § 1604(g)(3)(B). Additionally, the

Healthy Forests Restoration Act ("HFRA"), 16 U.S.C. §§ 6501 *et seq.*, directs the Forest Service to take action to "reduce wildfire risk" and "enhance efforts to protect watersheds and address threats to forest and rangeland health." *Id.* § 6501(1), (3). Specifically, the Forest Service is required "[a]s soon as practicable" to implement an "authorized hazardous fuel reduction project[ ]" on federal land where "the existence of an epidemic of disease or insects, or the presence of such an epidemic on immediately adjacent land and the imminent risk it will spread, poses a significant threat to an ecosystem component, or forest or rangeland resource." *Id.* § 6512(a)(4).

In satisfying its HFRA obligations, the Forest Service must also comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq. See* 16 U.S.C. § 6514(a). Thus, the Forest Service must prepare an environmental impact statement ("EIS") when formulating a hazardous fuels reduction project, which identifies alternatives to its proposed action. *Id.* § 6514(b); 42 U.S.C. § 4332(C). Such requirement forces the agency to take a "hard look" at its proposed action, and it must be "prepared early enough" in the decision-making process "so that it can serve practically as an important contribution . . . and will not be used to rationalize or justify decisions already made." *Metcalf v. Daley*, 214 F.3d 1135, 1141-42 (9th Cir. 2000) (internal quotation marks and citation omitted); 40 C.F.R. § 1502.5. The Forest Service is prohibited from "irreversibl[y] and irretrievabl[y]" committing resources before making its final decision. 40 C.F.R. § 1502.2(f); *see also Metcalf*, 214 F.3d at 1143 (internal quotation marks omitted).

The Forest Service must also give public notice of its decisionmaking process and allow for public collaboration. *See* 16 U.S.C. § 6514(e)-(g); 42 U.S.C. § 4332; 40 C.F.R. § 1500.2(d). For example, HFRA requires that the Forest Service hold "a public meeting at an appropriate location proximate to the administrative unit of the Federal land on which

the authorized hazardous fuel reduction project will be conducted" and provide advance notice of such. 16 U.S.C. § 6514(e)(2). Likewise, the Forest Service must give the public an opportunity to comment on its proposed action, and it must "assess and consider both individually and collectively" such comments in preparing its final EIS. 40 C.F.R. § 1503.4(a). Specifically, the Forest Service must disclose and respond to " 'any responsible opposing view which was not adequately discussed in the draft statement . . . .' " *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003) (quoting 40 C.F.R. § 1502.9(b)).

## II

### A

In the summer of 2000, the Bitterroot National Forest in Montana suffered severe damage caused by wildfires. The fires affected more than 307,000 acres and the entire Middle East Fork community[1] was evacuated. Although the Middle East Fork community was spared, many unburned fuels remain in the area, making it a high-risk area for future wildfires. Additionally, the region is in the midst of a Douglas-fir bark beetle epidemic, which is contributing significantly to the existing fuel levels. As a result of these conditions, the Forest Service developed the Middle East Fork Hazardous Fuel Reduction Project (the "Project").

The Project was developed under HFRA. The stated purposes for the Project are to (1) reduce wildland fire threats to the Middle East Fork community, (2) restore fire-adapted ecosystems in the Middle East Fork landscape, and (3) restore stands affected by the Douglas-fir bark beetle epidemic by treating infested areas and lands at risk. To determine how best to accomplish these goals, the Forest Service was

---

[1]The Middle East Fork area is two miles east of Sula, Montana, in Ravalli County.

required to "study, develop, and describe the proposed agency action; the alternative of no action; and an additional action alternative," if that alternative "is proposed during scoping or the collaborative process . . . and meets the purpose and need of the project." 16 U.S.C. § 6514(c)(1). Thus, here the Forest Service considered: (1) a no-action alternative ("Alternative 1"); (2) its preferred alternative ("Alternative 2"); and (3) an alternative proposed by The Ecology Center and Native Forest Network (now known as the WildWest Institute), Friends of the Bitterroot, and the National Forest Protection Alliance ("Alternative 3").

The following significant events occurred during the analysis and development of the Project. The Forest Service held at least twelve public meetings in the aftermath of the 2000 fires. Thereafter, the Forest Service began developing a vegetation treatment plan for the Middle East Fork Area. On March 18, 2004, a meeting was held in Sula, Montana to "discuss the results of the analysis and the initial recommendations" of implementing fuel reduction, addressing the bark beetle problem, and addressing timber harvest. Notice of the meeting was published in the *Ravalli Republic* newspaper, as well as through a press release. Another public meeting was held in Sula on September 28, 2004. A letter of invitation was mailed to approximately 120 individuals, organizations, and other agencies.

In November 2004, the Forest Service published a Notice of Intent to prepare an Environmental Impact Statement in the Federal Register. The Draft EIS analyzed the three alternatives discussed above and was made available to the public through the Bitterroot website. It was also mailed to members of the mailing list maintained by the Forest Service. The notice of availability was published in the Federal Register on April 22, 2005, thereby starting the 45-day comment period. Public comments were received and incorporated into the Final EIS, which was released in September 2005. During the comment process, the Forest Service responded to seventeen

Freedom of Information Act requests and provided over 15,500 pages of information.

When the Final EIS was released, Forest Supervisor Dave Bull held a press conference to announce the final decision. Certain vocal opponents of the Project were excluded from the press conference, including Jim Miller, President of the Friends of the Bitterroot. Thereafter, Supervisor Bull publicly apologized for holding a closed press conference.

In March 2006, the Forest Service published its Record of Decision ("ROD"), which detailed its decision to implement a modified version of Alternative 2. Alternative 2—Modified called for treating[2] 4,938 acres in the Middle East Fork area, with approximately 59% of all such treatments (2,893 acres) involving commercial treatments. The Forest Service made a number of changes to its original proposed Alternative 2 during the time between its publication of the Final EIS and the ROD in response to objections raised by WildWest. First, the Forest Service decided not to treat old growth habitat. Second, the modified plan would not treat units with greater than 15% detrimental soil reliance or units or portions of units projected to possibly have greater than 15% disturbance after the treatments. Third, the modified plan did not call for performing summer ground-based tractor harvest operations because the units could have greater than 15% disturbance after such treatments. Finally, the modified plan would "not treat stands where it has been determined that further field review is needed to corroborate the determination by the soil scientist of evidence of past harvest." Overall, the Forest Service dropped 1,534 acres from its proposed treatment plans in response to WildWest's objections.

---

[2]Most acres were to be treated by prescribed fire, a technique that seeks to reduce dangerous fuels such as brush and dead wood. Other treatments included removal of small diameter trees in overstocked areas, removal of infected or infested trees, and removal of larger trees at increased risk for beetle infestation.

B

After the Forest Service's final decision to implement the Project, WildWest filed suit in the United States District Court for the District of Montana, asserting that the Forest Service's decisionmaking process, as well as its substantive decision, violated NEPA, NFMA, and HFRA. Specifically, WildWest asserts the Forest Service committed procedural violations by (1) irretrievably committing resources in favor of its preferred alternative before making its final decision, (2) failing to engage in adequate public collaboration, and (3) ignoring competing scientific views. Substantively, WildWest challenges the Project's impact on soil productivity, old growth habitat, species viability, and watershed sedimentation.

Along with its complaint, WildWest moved for a temporary restraining order and preliminary injunction, primarily relying on its three procedural claims. The district court denied the motion, concluding in part that WildWest had made an insufficient showing that it was likely to prevail on the merits of such claims. We affirmed. *WildWest Inst. v. Bull*, 472 F.3d 587 (9th Cir. 2006).

Thereafter, the parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of the Forest Service defendants on all of WildWest's claims. The district court ruled against WildWest on the merits of its claims, but it also held that the procedural claims were waived as WildWest only "summarize[d] those arguments as necessary to preserve them for appeal" because such claims were previously raised at the preliminary injunction stage. *WildWest Inst. v. Bull*, 468 F. Supp. 2d 1234, 1241 (D. Mont. 2006) (internal quotation marks omitted).

After the district court's summary judgment ruling, WildWest moved for an emergency injunction pending appeal in the district court, which was denied. Order Denying Motion

to Stay, Jan. 18, 2007. WildWest then made a similar motion in this court, which we also denied. Order of February 5, 2008. WildWest now appeals the district court's summary judgment ruling.

## III

**[1]** Before issuing its final decision, the Forest Service is prohibited from taking any action that "limit[s its] choice of reasonable alternatives" identified in the decision-making process. 40 C.F.R. § 1506.1(a)(2). Such prohibition extends to "commit[ting] resources" which would prejudice the Forest Service's selection of alternatives. *Id.* § 1502.2(f). Construing a related regulation, we have held that a premature " 'irreversible and irretrievable commitment of resources' " violates NEPA. *Metcalf*, 214 F.3d at 1143 (quoting *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988)). As the Fourth Circuit has explained: "The proper inquiry in a NEPA case is . . . not whether an agency has focused on its preferred alternative, but instead whether it has gone too far in doing so, reaching the point where it actually has '[l]imit[ed] the choice of reasonable alternatives.' " *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005) (alteration in original) (quoting 40 C.F.R. § 1506.1(a)(2)).

**[2]** Here, WildWest argues the Forest Service prematurely and irretrievably committed financial resources in favor of its preferred alternative by marking trees in preparation for logging during the public comment period. Our cases have focused on the commitment of *natural resources*, not necessarily the agency's financial resources. For example, in *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998), we determined that there was no NEPA violation because the Forest Service had not "irreversibly and irretrievably committed the resources *of Ushk Bay* to logging." *Id.* at 1064 (emphasis added). Although the government had developed a tentative schedule designating certain forest areas for harvest, we emphasized that the schedule "ma[de] no com-

mitment of any part of the national forests because the government retain[ed] absolute authority to decide whether any such activities will ever take place on the lands." *Id.* at 1063 (internal punctuation and citation omitted).

Conversely, in *Conner*, we held that the government did prematurely commit resources in violation of NEPA where it sold gas and oil leases on national forest land without "reserv-[ing] . . . the absolute right to prevent all surface-disturbing activity." 848 F.2d at 1449; *see also Metcalf*, 214 F.3d at 1144 (holding that irretrievable commitment occurred when the government agreed to assist an Indian tribe in resuming whaling without conditioning such agreement "upon a NEPA determination that the . . . whaling proposal would not significantly affect the environment"). We specifically distinguished, however, similar leases that "make no commitment of any part *of the national forests* to surface-disturbing activities by the lessees because the government retains *absolute* authority to decide whether any such activities will ever take place on the leased lands." *Conner*, 848 F.2d at 1447 (first emphasis added).

WildWest is correct that a financial commitment can, in some instances, constitute an irretrievable commitment. For example, if an agency spent most or all of its limited budget on preparations useful for only one alternative, it may well have taken action "[l]imit[ing] the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a). In the instant case, the Forest Service's expenditure of $208,000 to pre-mark trees was clearly not so substantial an investment that it limited such choice.

**[3]** Thus, on the current record, the Forest Service's pre-marking of trees did not irretrievably commit it to a particular course of action. Although the Forest Service undertook preparatory actions in favor of logging, it clearly retained the authority to change course or to alter the plan it was considering implementing. Such is clearly demonstrated by the fact

that it excluded 410 acres of pre-marked timber from the modified plan it ultimately adopted. *See Friends of Southeast's Future*, 153 F.3d at 1063 (holding the government did not irretrievably commit forest resources where it retained the authority to change the amount of timber ultimately harvested); *see also Headwaters v. Forsgren*, 219 F. Supp. 2d 1121, 1129 (D. Or. 2002) ("The record does not show . . . that by pre-marking . . . trees, the Forest Service made such an 'irreversible and irretrievable commitment of resources' . . . to effectively foreclose other alternative actions."). The Forest Service's actions here easily support this assertion. Thus, we conclude the Forest Service's decision to pre-mark trees for cutting did not prematurely commit it to a specific course of action in violation of NEPA.

## IV

WildWest also argues the Forest Service failed to facilitate sufficient public collaboration. Specifically, WildWest asserts the Forest Service (1) provided insufficient notice of the Sula, Montana, meeting by removing conservation proponents from the notice mailing list and by failing to announce that a HFRA project would be discussed; (2) failed to indicate in its Final EIS that it received over 11,000 public comments opposing its proposed action; and (3) failed to give notice of when its Final EIS would be issued and improperly excluding conservation proponents from the press conference announcing such decision.

NEPA dictates that federal agencies "shall to the fullest extent possible . . . [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d). As mentioned above, HFRA also sets forth a specific public participation scheme. *See* 16 U.S.C. § 6514(e)-(g). However, in its reply brief, WildWest clearly asserts that it is not alleging the Forest Service violated HFRA. Thus, we proceed to analyze its public collaboration claims solely under NEPA.

A

As we have previously noted, the regulations governing public involvement adopted pursuant to NEPA "are general in approach." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952 (9th Cir. 2008). There are few specific requirements. *See* 40 C.F.R. § 1506.6.

[4] If an agency holds a public meeting, NEPA requires that it provide notice of such. 40 C.F.R. § 1506.6(b). The particular form such notice must take, however, is not specified.[3] *Envtl. Coal. of Ojai v. Brown*, 72 F.3d 1411, 1415 (9th Cir. 1995). Here, the Forest Service held two public meetings, and, before doing so, published an announcement in a local newspaper, issued a news release, and sent individual notices to interested members of the public identified on a mailing list. In any event, the record suggests WildWest did in fact receive notice from the Forest Service's mailing through its predecessor, The Ecology Center. We also reject WildWest's claim that the Forest Service's announcement was incomplete because it did not state that the meeting would address a "HFRA hazardous fuel reduction project." The Forest Service specifically stated that the meeting would allow the public an opportunity to discuss its "recommendations concerning fuel reduction, thinning, bark beatles, [and] timber harvest."

B

The Forest Service is required to "assess and consider . . . both individually and collectively" the public comments received during the NEPA process and to respond to such in

---

[3]The regulations distinguish between notice requirements for actions of national concern and those of only local concern. Because WildWest does not allege that the Forest Service failed to provide adequate national notice, we assume for purposes of this appeal that it need only provide adequate local notice.

its Final EIS. 40 C.F.R. § 1503.4(a). Again, however, the regulations do not mandate the form such response must take, instead providing a list of options including: modifying the agency's proposed action, developing or evaluating additional alternatives, supplementing its analyses, making factual corrections, or explaining "why the comments do not warrant further agency response."

**[5]** WildWest argues that the Forest Service violated NEPA by failing to identify in the Final EIS the *number* of opposing comments it received. We disagree. There is no requirement that the Forest Service identify the number of public comments it received. *See* 40 C.F.R. §§ 1502.9(b), 1503.4. Further, the Final EIS responds appropriately to the public comments. The Forest Service summarized the nature of the comments it had received and the primary concerns that were raised. It also provided specific substantive responses to such concerns and included a six and a half page list of the commenters.

C

**[6]** Finally, WildWest contends that the Forest Service violated NEPA by failing to announce when it would make its final decision and by excluding individuals who opposed its decision from the press conference announcing such. Again, NEPA does not require that federal agencies give notice of when it will announce its final decision or that it make such announcement a public event. Thus, even though the Forest Service's decision to hold a closed press conference was perhaps unfortunate, it was not a violation of NEPA.

V

WildWest contends that the Forest Service violated NFMA's substantive soil productivity requirement.[4] Relat-

---

[4]As we turn to WildWest's substantive claims, we are reminded by this court's recent en banc decision in *The Lands Council v. McNair*, No. 07-

edly, it argues that the Forest Service violated NEPA by disregarding the data and opinions of its own soils expert, Ken McBride ("McBride").

A

**[7]** In addition to their general obligation to respond to public comments under 40 C.F.R. § 1503.4(a), federal agencies must specifically " 'discuss at appropriate points in the final [EIS] any responsible opposing view which was not adequately discussed in the draft [EIS] and . . . indicate the agency's response to the issues raised.' " *Ctr. for Biological Diversity*, 349 F.3d at 1167 (quoting 40 C.F.R. § 1502.9(b)). A failure to do so is itself a NEPA violation. *Id.* at 1168. An agency must also "insure the professional integrity, including scientific integrity, of the discussions and analyses" included in its EIS. 40 C.F.R. § 1502.24.

The Forest Service's Draft EIS incorporated McBride's soil analysis report, but McBride indicated that his report had been edited, resulting in a "deliberate removal of information that

35000, 2008 WL 2640001 (9th Cir. July 2, 2008) (en banc), that we do not "act as a panel of scientists that instructs the Forest Service how to validate its hypotheses regarding wildlife viability, chooses among scientific studies in determining whether the Forest Service has complied with the underlying Forest Plan, and orders the agency to explain every possible scientific uncertainty." *Id.* at *4. Rather, we only require "that the Forest Service . . . support its conclusions that a project meets the requirements of the NFMA and relevant Forest Plan with studies that the agency, in its expertise, deems reliable. The Forest Service must explain the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable. We will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Id.* at *10. Although the issuance of *McNair* between oral argument and the filing of this opinion does not change our views on any substantive topic, it does strengthen them.

accurately portrayed the conditions of the soils and the pre-scriptions and mitigations needed to address those degraded soil conditions." Thereafter, the Forest Service formed a peer review group to "check for consistency and repeatability and compare [its] results . . . to [McBride's]."

The peer review group performed a sample analysis of some of the units previously analyzed by McBride. The group used a modified Howes methodology, which allows soil to be classified under six different categories but does not assume that all soil disturbance is detrimental. McBride, on the other hand, used the " 'rapid' method for determining soil distur-bance," under which "only areas that are unchanged from nat-ural conditions are recorded as non detrimental disturbance." Though the peer group identified a comparable amount of dis-turbance, it found a lesser degree of *detrimental* disturbance and it concluded all of the sample areas satisfied soil quality guidelines. The group further indicated that its chosen meth-odology was more appropriate in "assessing the threshold for an activity unit," whereas McBride's methodology "should be used to flag project areas that may depart from the soil quality guidelines for more accurate and intensive assessment at the project level."

[8] In its Final EIS, the Forest Service adopted the peer review group's findings, concluding that McBride's method-ology "overestimate[d] the amount of *detrimental* soil dam-age." (emphasis added). It further discounted McBride's survey as "primarily ocular . . . with any measurements being used to verify what was being observed." Contrary to Wild-West's assertion, however, the Forest Service did not com-pletely disregard McBride's findings. Rather, the Final EIS states that even though McBride's methodology "illustrate[s] a conservative approach to estimating soil condition," his findings regarding the level of disturbance are "used in the direct, indirect, and cumulative effects discussions." In fact, the Forest Service modified the Project in its ROD, providing that it would "not treat any units with 15% or greater soil dis-

turbance or units or portions of units projected to possibly have 15% or greater detrimental disturbance after proposed treatments," resulting in postponed action on numerous units.

WildWest also argues that the Forest Service removed from its analysis all of McBride's findings regarding cumulative soil impacts. However, the Final EIS contains a detailed analysis of the cumulative impact caused by logging and other historical activities, and specifically acknowledges McBride's concern that "[t]ime periods of 20-40 years may be required to improve the surface layer." The Final EIS also includes an analysis of the soil disturbance in each subwatershed. That the Forest Service reordered the format of its cumulative impact analysis from the Draft EIS to the Final EIS does not support WildWest's contention that it failed to address such issue. *See Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 682 (9th Cir. 2000) (explaining that "[w]e review the EIS as a whole").

B

**[9]** Under NFMA, the Forest Service may harvest timber from national forests only where "soil, slope, or other watershed conditions will not be irreversibly damaged." 16 U.S.C. § 1604(g)(3)(E)(i). Further, NFMA directs the Forest Service to evaluate the effects of its management plans on the productivity of the land "based on continuous monitoring and assessment in the field." *Id.* § 1604(g)(3)(C). The Bitterroot National Forest Plan does not provide specific numeric soil quality standards. Therefore, the Forest Service applied its Region One Soil Quality Standards ("R1-SQS"), which provide that activities should not result in a cumulative detrimental impact of more than 15% of the activity area. WildWest makes two arguments related to this substantive requirement. First, it argues that the R1-SQS are facially unreliable. Second, it argues that the Forest Service failed to properly consider cumulative impacts in determining whether the project satisfied such standard.

1

WildWest failed to raise its facial challenge in the district court. Generally, an issue raised for the first time on appeal is deemed waived. *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004). We have discretion, however, to consider a newly raised issue (1) in the "exceptional" case where "review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process," (2) when the issue arises while on appeal "because of a change in the law," or (3) when the issue is "purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Id.* (citation omitted).

WildWest did not address these discretionary factors in its briefing, instead baldly asserting that "this case presents an appropriate fact situation for this Court to pass on the adequacy of the R1-SQS." However, on our own review of such factors, we conclude it is not appropriate to consider Wild-West's newly raised argument in the first instance. The first two factors do not apply here, and we conclude that the current record is not sufficiently developed as to the issue Wild-West seeks to raise.

2

**[10]** WildWest also contends the Forest Service violated NFMA by failing properly to consider cumulative impacts on soil productivity.[5] WildWest analogizes this case to *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005), where we held that the Final EIS violated NEPA because it contained "no discussion of the connection between individual harvests and the prior environmental harms from those harvests that

---

[5]Much of WildWest's argument on this point appears to conflate NFMA's substantive requirement with NEPA's procedural requirement that agencies conduct cumulative impact analyses. 40 C.F.R. § 1508.7. We have previously rejected WildWest's procedural challenges on this point.

the Forest Service now acknowledges." *Id.* at 1027. As discussed above, however, the record shows that the Forest Service took a "hard look" at cumulative impacts from past timber harvests, as well as other historical activities and events, and concluded that these past activities did not reduce soil or site productivity in violation of the soil quality standards.

WildWest also argues the Forest Service erred by narrowing its soil conditions analysis to particular proposed harvesting units instead of taking a broader landscape view. Agencies have "discretion to determine the physical scope used for measuring environmental impacts" so long as they do not act arbitrarily and their "choice of analysis scale . . . represent[s] a reasoned decision." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

**[11]** Here, although the Final EIS included broader sub-watershed data as background, the Forest Service explained that such landscape-level analysis is unreliable because it cannot be correlated to site-specific impacts under the R1-SQS. Specifically, it determined that such correlation is impossible "because of the variability in soil texture, the amount of organic matter and ground cover, soil response to past projects, and the intensity of past projects." On this record, we cannot conclude that such reasoning is arbitrary.

VI

**[12]** WildWest makes several arguments with respect to the Forest Service's management of old growth habitats. NFMA requires that the Forest Service's management of national forests "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B). NFMA does not, however, mandate a specific old growth standard. Rather, such standards arise under the relevant Forest Plan. "[A]ll management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the Forest Act

. . . ." *Rittenhouse*, 305 F.3d at 962. Also applicable here is HFRA's requirement that the Forest Service "maintain, or contribute toward the restoration of, the structure and composition of old growth stands" when undertaking fuel reduction projects. 16 U.S.C. § 6512(e)(2).

A

The Record of Decision states that the Project "will not treat old growth habitat." WildWest challenges this assertion, arguing the Forest Service erred in its classification of old growth habitat.

The Forest Service analyzed old growth habitat in the Project area based on "stand-wide structure and characteristics," as dictated in the Forest Plan. As old growth characteristics vary by region, it further relied upon criteria specifically "describ[ing] old growth forest types of the northern region . . . [which] was intended to provide local definitions of old growth to be used in the implementation of Forest Plans." Such criteria require a minimum number of live trees. Due to the Douglas-fir bark beetle infestation, the Forest Service conducted field surveys for purposes of classifying old growth habitat in both 2004 and 2005. Over 4,421 acres were evaluated on the ground.

**[13]** WildWest contends the Forest Service's classification methodology was flawed because it based its analysis on "imminently dead" trees. It further argues, without citation to any authority, that while the regional criteria utilized by the Forest Service is proper for determining whether a stand is old growth as an initial matter, it is not proper for determining that a stand is no longer old growth. As the Forest Service points out, the "imminently dead" standard applied to tree marking, not to classifying old growth status. And in any event, WildWest's arguments on this point are not convincing. The Forest Service properly applied its selected methodology, and it disclosed such methodology, as well as its

findings, to the public.[6] It further addressed objections to its methodology raised during the comment period.

WildWest further argues that the Project violates substantive old growth standards. Accepting the Forest Service's conclusion that the Project, as finally implemented, does not treat old growth, however, such arguments are unavailing.[7] *See Lands Council*, 395 F.3d at 1036 ("[B]ecause no old growth forest is to be harvested under the selected alternative, we reject the contention that the Project will be impermissible [because] . . . the 'allocated old growth' within the Forest is less than the Forest Plan requirement.").

**[14]** We also reject WildWest's argument that the Forest Service is required to designate replacement habitat.[8] Assuming (but not deciding) that any such requirement exists, we conclude the Forest Service has satisfied it by demonstrating

---

[6]WildWest argues that the Forest Service violated NEPA by failing to include the results of its surveys in the administrative record. NEPA requires that the Forest Service disclose the hard data supporting its expert opinions to facilitate the public's ability to challenge agency action. *See Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998), *overruled on other grounds by McNair*, 2008 WL 2640001. Contrary to WildWest's assertion, however, the data supporting the Forest Service's assessment of units in the Project area, including silvicultural diagnoses, silvicultural prescriptions, common stand exams, and walk through exams, are contained in the record.

[7]To the extent WildWest challenges the substantive standards themselves, we also conclude such arguments are not properly before us. *See Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002)("[N]ot all forest-wide practices may be challenged on the coattails of a site-specific action; there must be a relationship between the lawfulness of the site-specific action and the practice challenged.").

[8]WildWest relies on *Lands Council v. Vaught*, 198 F. Supp. 2d 1211 (E.D. Wash. 2002), in which the district court held that to comply with NFMA, the Forest Service must "demonstrate either that adequate old growth acreage exists in the [forest] to satisfy the [Forest Plan's] old growth standards or that the timber slated to be harvested under the Project is not needed to fulfill old growth standards." *Id.* at 1224. *Vaught* is not binding on this Court, and we decline to address its merits at this time.

that the Project retains "the largest, healthiest and dominant residual trees" that may some day become old growth. Additionally, the Final EIS indicates that the proposed treatments will contribute to the health of the remaining trees, "mak[ing them] more resistant to insect and disease and future fires, meaning that in the future they have a higher probability of contributing toward the minimum criteria for live larger trees per acre for their respective old growth type group."

B

WildWest also argues the Forest Service failed adequately to consider the impact the Project, particularly its logging component, will have on population trends of management indicator species ("MIS") such as the pileated woodpecker, northern goshawk, and black-backed woodpecker. The Bitterroot Forest Plan provides that "[t]he amount and distribution of old growth will be used to ensure sufficient habitat for the maintenance of viable populations of existing native and desirable non-native vertebrate species, including two indicator species, the pine marten and pileated woodpecker." The Final EIS includes assessments of the Project's effect on the pine marten and pileated woodpecker,  and explains that the Project would not likely contribute to loss of their viability. WildWest does not contest the Forest Service's conclusions with respect to the marten, but it does object to the Forest Service's conclusions regarding the pileated woodpecker and two other species, the northern goshawk and black-backed woodpecker.

1

[15] WildWest contends the Final EIS does not acknowledge the pileated woodpecker's preference for larger trees and snags for nesting, despite the fact that such trees and snags will be removed under the Project. It further argues other factors such as patch size and canopy cover were ignored. On the contrary, however, the Final EIS does consider the pileated

woodpecker's habitat needs. For example, it notes that the pileated woodpecker prefers snags "greater than 21 inches in diameter at breast height," "areas with 10% cover," and nests "more than 40 feet off the ground." Although the Forest Service acknowledges the possibility that "some snags, which could be used for nesting, would be removed or burned," it notes that "the trees which are potentially important to pileated woodpeckers for nesting will generally be retained through project design and mitigation." The Final EIS also discusses historical impacts on pileated woodpeckers, explaining that "[p]rior timber harvests, fires, and fire suppression do not appear to have affected species viability because monitoring indicates they are present on all monitoring transects and detections have increased slightly each year between 2000 and 2003." On this record, we conclude the Forest Service took the requisite "hard look" at the Project's potential impact on the pileated woodpecker.

2

Next, WildWest argues the Forest Service inadequately analyzed the impact on the northern goshawk, which it deems a "sensitive species."[9] Acknowledging that the Project avoids known nesting habitats, WildWest complains the Forest Service failed to conduct surveys to identify nest stands. However, the Final EIS indicates the Forest Service did conduct such surveys within the Project area that identified existing and potential nest territories,[10] and the Project avoids treatment within thirty acres of these areas.

According to WildWest, the Final EIS "ignored the best science available at the time of analysis," which suggests that "it is essential to the viability of goshawks that 20-60% older

---

[9]Although the goshawk was once deemed a sensitive species, it was removed from the Forest Service's sensitive species list in 2004.

[10]Since goshawks "can be notoriously difficult to find," the Forest Service was unable to locate them in the potential nest stands.

forest levels be maintained in goshawk territories." To support its contention, WildWest moved to supplement the record with a declaration from a former Forest Service employee, Dr. Sara Johnson. The district court denied such motion, however, because it was filed after the completion of summary judgment briefing.

We may consider extra-record materials (1) when necessary to determine whether the agency considered all relevant factors in making its decision; (2) when the agency has relied on extra-record materials; (3) when necessary to explain technical terms or complex subject matter; or (4) when the agency has acted in bad faith. *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703-04 (9th Cir. 1996). WildWest argues the first scenario applies because the Johnson declaration responds to an "unsigned memorandum in the record dated March 8, 2006—seven months after the F[inal] EIS, and only a few weeks prior to the final decision." We disagree. Although WildWest attempts to characterize the memorandum as "new information not provided to the public in the F[inal] EIS," as the district court noted, the memorandum responds to objections raised during the administrative process and explains information previously included in the NEPA documents.

[16] We conclude the Forest Service satisfied NEPA by properly considering the northern goshawk's habitat needs. The Final EIS explicitly recognizes that the goshawk prefers a "nesting habitat with a dense overstory of large trees and an open understory of grass and shrubs." It also explains that the Douglas-fir bark beetle epidemic has had a significant impact on goshawk habitat in the Project area because it eliminated the "high live crown canopy." Although the Project may affect goshawk habitat, the Forest Service determined that treatment would retain live overstory, and that "the incremental small reduction of canopy closure through treatment would likely be a negligible reduction, if a reduction at all, in habitat suitability." Additionally, considering the impact on goshawk

prey, the Forest Service determined that treatments "may actually improve or create foraging habitat for goshawks."

3

**[17]** Finally, WildWest asserts the Forest Service did not properly consider the Project's impact on the black-backed woodpecker. Although the Forest Service acknowledges that "[f]ire suppression and extensive salvaging of burned trees has probably reduced habitat for black-backed woodpeckers," the record supports its conclusion that the Project "would have no impact on black-backed woodpeckers or their habitat." First, as noted in the Final EIS, the Forest contains ample habitat for black-backed woodpeckers adjacent to the Project area. Second, the Project area contains only minimal black-backed woodpecker habitat because of the lack of moderate to high intensity fires in the past. Thus, we reject WildWest's argument on this point as well.

VII

For the foregoing reasons, we conclude the Forest Service was properly granted summary judgment on all of the claims asserted against it by WildWest.

**AFFIRMED.**