**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

In re:                  )    BAP No.    NC-15-1120-KiTaJu

ANTON ANDREW RIVERA and    )    Bk. No.    5:14-54193
DENISE ANN RIVERA,        )

           Debtors.    )

_____ )

ANTON ANDREW RIVERA;      )
DENISE ANN RIVERA,        )

          Appellants,    )    **A M E N D E D**
                         )    **M E M O R A N D U M**[1]
v.                           )

DEUTSCHE BANK NATIONAL TRUST   )
COMPANY,               )

          Appellee.    )

_____ )

Argued and Submitted on July 28, 2016,
at San Francisco, California

Originally Filed - August 16, 2016
Amendment Filed - October 6, 2016

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable M. Elaine Hammond, Bankruptcy Judge, Presiding

_____

Appearances:    Ronald H. Freshman argued for appellants Anton Andrew Rivera and Denise Ann Rivera; Stefan Perovich of Keesal, Young & Logan argued for appellee Deutsche Bank National Trust Company as Trustee for WAMU Mortgage Pass-through Certificates Series 2005-AR6 Trust.

_____

Before:    KIRSCHER, TAYLOR and JURY, Bankruptcy Judges.

_____

   [1]   This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, it has no precedential value. See 9th Cir. BAP Rule 8024-1.

-1-

Chapter 13[2] debtors Anton and Denise Rivera ("Riveras") appeal an order overruling their objection and establishing the amount of the secured claim of Deutsche Bank National Trust Company as Trustee for WAMU Mortgage Pass-through Certificates Series 2005-AR6 Trust ("Deutsche Bank" or "Trust") in the amount of $532,272.10.  We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.    Prepetition events**

In 2004, the Riveras obtained a refinance loan for their home in Bethel Island, California (the "Property").  They executed an Adjustable Rate Note ("Note") for $440,000, payable to Washington Mutual Bank, FA.  To secure the Note, the Riveras executed a deed of trust ("DOT") in favor of Washington Mutual and created a lien against the Property.  The DOT was subject to an Adjustable Rate Rider, which amended and supplemented the DOT.

Various provisions of the Note and DOT are relevant here. The Note provided for monthly interest rate changes on the first of every month ("Change Date") and changes to the monthly payment. Both the Note and the Adjustable Rate Rider conspicuously warned in all upper case letters:

> THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT.  MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN 125% OF THE ORIGINAL AMOUNT (OR $550,000).  MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE.  A BALLOON PAYMENT MAY BE DUE AT MATURITY.

---

[2]  Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Sections 4(G), 4(H) and 4(I) of the Note provided:

**4(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization.** Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad [sic] the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**4(H) Limit on My Unpaid Principal; Increased Monthly Payment.** My unpaid principal can never exceed a maximum amount equal to 125% of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that 125% limitation, I will begin paying a new minimum monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new minimum monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**4(I) Required Full Monthly Payment.** On the FIFTH anniversary of the due date of the first monthly payment, and on that same day every FIFTH year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

Thus, Section 4(G) expressly warned the Riveras that their monthly payment could be less than the amount of the interest portion and, for each month the interest portion was underpaid, that the difference would be added to the unpaid principal balance and interest would accrue on the amount of the difference, resulting in a loan typically called a negative amortization loan. If, however, payments exceeded the interest portion, the excess

-3-

would be applied towards the principal. Sections 4(H) and 4(I) indicate that the Riveras' loan was an interest-only loan for the first five years.

The DOT provided how the Riveras' mortgage payments were to be applied:

> **2.    Application of Payments or Proceeds.** [A]ll payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) any amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
>
> . . . .
>
> **3.    Funds for Escrow Items.** Borrower shall pay to Lender on the day the Periodic Payments are due under the Note, until the Note is paid in full, a sum . . . to provide for payment of amounts due for: (a) taxes . . . (c) premiums for any and all insurance required by the Lender . . . These items are called "Escrow Items[.]"

The Prepayment Fee Note Addendum, which amended and supplemented the Note, allowed the Riveras to make payments of principal before they were due. Any partial prepayment of principal before it was due was not subject to a penalty but would first be applied to the interest accrued on the amount of principal prepaid and then to the principal balance of the Note.

The Truth in Lending Disclosure Statement signed by the Riveras showed that the payment was $1,415.21 for the first year, $1,889.97 for the fifth year, and $2,327.93 for the final twenty years of the thirty-year loan. The disclosure warned that the Note had a variable interest rate feature and stated that

-4-

disclosures about this feature had been provided to the Riveras. Mrs. Rivera denied ever receiving the disclosures.

According to the loan payment history provided by Deutsche Bank, the Riveras struggled to make the monthly payments from the beginning, frequently paying them late and being subject to a late fee of no less than $70.76.

Each monthly home loan statement sent to the Riveras noted the current interest rate, the principal and escrow balances and the year-to-date figures for principal, interest, property taxes and insurance paid. The year-end "principal paid" figures showed a negative balance in 2006, 2007 and 2008. In addition, the "principal balance due" figure fluctuated from statement to statement, but showed a balance of $469,584.23 in September 2009, the last month the Riveras made a regular contractual payment.

Each monthly statement also offered the Riveras what has been referred to as "pick a pay" payment options. The Riveras were given four alternatives for payments each month:

     1.    reduced interest and escrow (the "Minimum Payment");

     2.    full monthly interest and escrow;

     3.    full principal and interest based on the remaining scheduled loan term and escrow; and

     4.    full principal and interest based on a 15-year amortization and escrow.

Mrs. Rivera admitted at the eventual evidentiary hearing that she was aware of the "pick a pay" options for the loan.

As part of a HAMP application submitted in September 2009, the Riveras noted that the principal balance of the Note was $469,981. In an attached letter, Mrs. Rivera explained that when

the Riveras obtained the loan, they "specifically asked for a non-negative amortization program." Mrs. Rivera went on to say that the Riveras "didn't understand the fine print," and acknowledged that they "didn't ask the right questions" and could "blame only [them]selves for [their] rash actions."

In October 2009, the Riveras entered into a Home Affordable Modification Trial Period Plan ("TPP") with the then servicer of the loan, JP Morgan Chase Bank, NA ("Chase"). Between October and December 2009, the Riveras made three TPP payments of $1,736.00. These payments were placed in a suspense account and applied against the contractual payments due for September and October 2009. Also in October 2009, Chase sent the Riveras a Debt Validation Notice, which stated that the principal balance on the Note was $469,584.23.

In November 2009, Chase sent the Riveras a "Change Date" letter stating that their new monthly payment amount was changing starting in January 2010 and was based on an interest rate of 3.358%, a remaining term of 300 months and a "projected principal balance" of $467,393.65.

Even though the Riveras were no longer making payments, Chase sent similar Change Date letters in November 2010 and November 2012. The 2010 letter stated that the Rivera's new monthly payment starting in January 2011 would be $2,200.79, based on an interest rate of 2.95300%, a remaining term of 288 months and a "projected principal balance" of $453,689.47. The 2012 letter stated that the Riveras' new monthly payment starting in January 2013 would be $2,155.14, based on an interest rate of 2.76%, a remaining term of 264 months and a "projected principal balance"

-6-

of $426,104.71. Notably, the "projected principal balance" stated in each of the Change Date letters was based on the assumption that "all regularly scheduled payments" were being made.

**B. Postpetition events**

The Riveras filed a chapter 13 bankruptcy case on December 7, 2012. Deutsche Bank, with Chase as servicer, filed a proof of claim evidenced by the Note, the DOT and other supporting documents ("Claim"). Deutsche Bank asserted a secured claim in the amount of $532,272.10 against the Property, with prepetition arrearages of $106,389.03. Deutsche Bank claimed the principal balance owed on the Note was $468,601.71, with interest of $43,452.77, for a total of $512,054.48. Foreclosure fees and costs totaled $2,908.44, and the escrow shortage was calculated at -$19,448.99.

**1. The objection to Deutsche Bank's Claim**

The Riveras filed a pro se objection to the Claim, contesting a variety of issues ("Claim Objection"). They also filed two related adversary proceedings against Deutsche Bank, contesting standing and the validity of its lien. Both adversary proceedings were ultimately dismissed and those orders have become final. For our purposes here, the Riveras disputed the principal balance of $468,601.71 stated in the Claim; they alleged that it conflicted with the principal amount of $440,000 identified in the Note and the balance stated in the recent November 2012 Change Date letter.

The Claim Objection hearing was continued several times and ultimately set for trial. During this time, the Riveras hired and fired counsel, hired their current counsel and discussed settlement with Deutsche Bank; Deutsche Bank filed two

-7-

declarations from Chase employees in support of its opposition to the Claim Objection. In addition, on November 18, 2013, Chase sent the Riveras a Change Date letter, which stated that their new monthly payment starting in January 2014 would be $2,151.98, based on an interest rate of 2.74400%, a remaining term of 252 months and a "projected principal balance" of $411,845.68. As with the other Change Date letters, the "projected principal balance" figure was based on the assumption that all regularly scheduled payments were being made. Chase sent the Riveras another Change Date letter on November 17, 2014, which stated that their new monthly payment starting in January 2015 would be $2,670.98, including estimated taxes and insurance, based on an interest rate of 2.71500% and a remaining term of 240 months. The letter did not use the term "projected principal balance" but stated that the loan balance was $397,060.14.

The Riveras (pro se) also filed a reply to Deutsche Bank's opposition to the Claim Objection and the declarations, raising new arguments not previously asserted. In particular, the Riveras argued that according to Bill Paatalo, an expert in the securitization of loans and pooling and servicing agreements (PSAs)[3] retained as a witness for one of their adversary proceedings, Deutsche Bank had been reporting to the Trust certificate holders that no losses had been incurred on the loan because the servicer had been advancing payments after the Riveras

[3] The Riveras' loan is part of a pool of loans that have been securitized and are now held in a Real Estate Mortgage Investment Conduit (REMIC) trust. PSAs are the contracts between the trust, which holds the mortgage loans, and the servicer, who collects payments and deposits them into the trust pursuant to the PSA.

stopped paying. The total amount advanced was approximately $90,714.70. Thus, argued the Riveras, the loan beneficiary had incurred no default or losses and no arrears were due. The Riveras contended that because the arrearages were paid by the servicer, they were not in default and Deutsche Bank had no grounds to assert a claim for unpaid principal and interest.

In another statement submitted a few months before trial, the Riveras argued that based on Paatalo's investigation the principal balance was at or below $411,000, given the records of Washington Mutual Securities, Inc., which stated that as of April 2014 the principal balance was $413,057.64 with zero losses and in decline.

In a supplement to their Claim Objection, the Riveras argued that Deutsche Bank had still failed to explain the "gap" in the principal balance — i.e., why the Claim stated that the principal balance was $468,601.71, while the Change Date letters stated different and much lower amounts, as low as $397,060.14 in the 2014 letter.

The parties then filed their trial briefs. The Riveras theorized as to why the Change Date letters between 2012 and 2014 had shown a declining principal balance. They contended that the servicer, which they equated to a co-obligor or guarantor of the Note, had been making payments on the Note to the Trust in order to protect its own interest and to avoid breach of its contractual responsibilities to Deutsche Bank under the PSA. Thus, claimed the Riveras, these third-party payments had satisfied the debt. The Riveras argued that servicers have no subrogation rights, so Deutsche Bank was unable to collect the advances on the servicer's behalf. By trying to collect them, argued the Riveras, Deutsche

-9-

Bank was engaging in fraud. The Riveras contended that the most remaining on the debt was $397,060.14.

Secondly, the Riveras asserted a new argument and contended that the payment application method used by the servicer violated the terms of the DOT. Section 2 of the DOT provided that all payments were to be paid in the following priority: (1) interest due under the Note; (2) principal due under the Note; and (3) amounts due under Section 3 — escrow items (taxes, insurance, etc.). Here, the servicer applied the payments first to escrow, then to interest, then to principal — in direct violation of the DOT. The Riveras argued that the impact of misapplying the payments was an increase in principal, on which the lender earned more interest, and refunds to borrowers for overpayment on escrow where they intended to pay the interest and principal on the loan. The Riveras contended, without citing to any evidence, that had the payment been applied pursuant to the terms of the DOT, the most the principal would have increased by October 2009 was $1,838.67.

Deutsche Bank contended that the loan history from 2004 to the petition date accurately reflected the principal balance due on the Riveras' loan. Deutsche Bank explained that the principal balance increased over time from the initial $440,000 because the Riveras did not make a full payment every month, instead sometimes making the optional minimum payment that did not cover all of their monthly interest. As a result, the unpaid interest was added to the outstanding principal balance.

As for the servicer advances, Deutsche Bank argued that the Riveras arguments were misplaced. The advances were not made for

-10-

the Riveras or on their behalf; they were made under a contract between the servicer and the Trust (the PSA) and were reimbursable to the servicer.  As such, the Riveras could not rely upon the servicer advances to argue that their debt was being satisfied or extinguished or that their principal balance was decreasing.  The Riveras' reliance on the Change Date letters for the principal balance due was also misplaced.  These letters were meant to notify borrowers with adjustable rate mortgages of the changes in their interest rate.  The projection figures also assumed that borrowers were current on their monthly payments and were on schedule to pay off their loan in full within the scheduled remaining term of the loan.  Here, the remaining term of the Riveras' loan had not decreased to 288 months, to 264 months or to 240 months, because their payment for November 2009 was still due.

In addition, argued Deutsche Bank, the Riveras were notified of the claimed principal balance of $468,601.71 in numerous other documents, including a modification letter sent to them in March 2010, a statement of ineligibility sent in September of 2011, a follow up letter in December 2011, correspondence dated February 7, 2013, and the September 2009 home loan statement, which stated that the balance was $469,584.23 and was consistent with the $468,601.71 figure because the Riveras' subsequent TPP payments slightly reduced the principal balance.  Even though Mrs. Rivera stated that these documents stated the principal balance of $468,601.71, she testified that she had always disputed the amounts asserted by Chase.

The parties then filed multiple motions in limine.  Deutsche Bank sought to exclude any evidence regarding the servicer

-11-

advances to the Trust, which it claimed was irrelevant; the advances did not extinguish or otherwise alter the Riveras' debt obligations. Deutsche Bank also sought to exclude any evidence as to the Riveras' new "payment application" argument; that argument had already been rejected by California federal courts that have analyzed similar DOT provisions. Deutsche Bank explained that the DOT permitted the application of escrow payments when they became "due under the note," which was every month. Conversely, the principal and interest payments were **not** "due under the note" in full each month because the Riveras' loan contained a negative amortization feature. Thus, argued Deutsche Bank, the servicer properly applied the payments to escrow first, then interest, then principal, as contemplated by the order of priority set forth in Section 2 of the DOT. Finally, Deutsche Bank sought to exclude any testimony from Paatalo, the Riveras' purported expert witness. The bankruptcy court denied these motions.

**2. Trial on the Claim Objection**

Witnesses at trial included Margaret Dyer, an employee of Chase, Mr. Paatalo and Mrs. Rivera. Numerous exhibits were admitted, many of which are missing from the record.

Dyer testified as to the features of the Riveras' loan, why the principal balance increased over time, and the relationship between Deutsche Bank and Chase under the PSA. Dyer explained that the Riveras signed an adjustable rate loan, which contained a negative amortization provision and allowed the principal balance to increase. The Riveras had payment options that allowed them to make a reduced payment and to increase the unpaid principal balance. As Dyer explained, when the Riveras made the Minimum

-12-

Payment, which was the reduced interest and escrow option, the escrow would be paid and the remainder paid toward interest. The difference between the full interest payment minus the reduced interest payment would then be added to the unpaid principal balance, causing it to increase. Dyer explained that a full principal and interest payment was not due or required until the unpaid principal balance reached $550,000 (125% of the original principal) or at year five. As for any "projected principal balances" noted in the Change Date letters, Dyer testified that the figures presented assumed the borrower was current on payments and had not gone into default.

When confronted with the payment options and the loan history document on cross-examination, Dyer explained that in the case of a negative amortization loan borrowers are only required to make the Minimum Payment; the others are options. Chase's system is set up to process a payment as though a borrower has made only the Minimum Payment, because that is all that is required to advance the due date on this type of loan. Dyer explained that when Chase receives a full payment, it applies the money to escrow, then the minimum to interest, which then reflects an increase in the principal balance. However, Chase then applies the remainder to reduce the principal balance.

As for servicer advances, Dyer testified that advances are reimbursable to the servicer under the PSA. She testified that advances are not made on behalf of the borrower, nor do they eliminate a borrower's obligation to make payments under the note.

Over Deutsche Bank's objection, the bankruptcy court allowed Paatalo's testimony on the limited issues of identifying key terms

-13-

of PSAs and the information he obtained about the Riveras' loan from ABSNet, a subscriber service that provides "back accounting" information on mortgage-backed securities. Paatalo testified generally as to the key terms in a PSA, such as servicer advances in Section 4.02. He also stated that according to ABSNet, the servicer had been making advances to the Trust for the Riveras' loan and no losses were being reported. Paatalo agreed that ABSNet reflected the balance of the Riveras' loan as $468,601.71, as stated in the Claim.

Finally, Mrs. Rivera testified that it was never her intent to make minimum monthly payments between January 2005 and December 2005, and she did not find out until the end of 2005 that their payments were insufficient to reduce the principal balance. Mrs. Rivera testified that she and her husband were told by their loan broker that the first 12 monthly payments of $1,415.21 included principal and interest. Mrs. Rivera testified that she and her husband told the loan broker they did not want a negative amortization loan. In response, the loan broker told the Riveras their loan was not that type of loan, but that it was a "pick a pay" loan. Mrs. Rivera testified that nowhere in any of the loan documents did it explain they were getting a negative amortization loan.

The bankruptcy court took the matter under advisement, noting that even though the Riveras' issue of payment application pursuant to the DOT was not raised until the trial briefs and motions in limine, it would consider all of the arguments made.

**3.    The bankruptcy court's decision on the Claim Objection**

The bankruptcy court entered its order and Memorandum

-14-

Decision overruling the Riveras' objection and establishing the amount of the Claim at $532,272.10 ("Claim Order"). The court initially found that based on the evidence, the Riveras knew they had an interest-only loan in 2005 and sought to make additional payments to reduce the principal. However, since the funds they paid often fell between the Minimum Payment (Option 1) and full interest payment (Option 2), the result was an increase in the principal balance — albeit less than if they had only paid the Minimum Payment. In addition, late fees or pay-by-phone fees often reduced the funds available to apply towards interest or principal. The court also found the detailed loan history provided by Deutsche Bank was more convincing evidence of the principal balance than references made in the Change Date letters.

As for the servicer advances, the bankruptcy court first found that the Riveras were not a party to nor a beneficiary of the PSA. Secondly, nothing in the PSA provided that servicer advances satisfied the obligations of the Riveras to the holder of their Note. The provisions of the PSA authorizing the liquidation and foreclosure of loans not paid by borrowers underscored this interpretation. After foreclosure, the servicer is authorized to reimburse itself for prior advances that are not recoverable from the liquidation proceeds. Accordingly, the court held that the Riveras had failed to establish that any party to the PSA became a guarantor or obligor of the Riveras' obligations on their Note.

Finally, with respect to the disputed payment application method used by the servicer, the bankruptcy court reasoned that the Riveras' argument failed to consider that during the time they made payments from 2005 to 2009, no principal was "due" on the

-15-

Note.  In contrast, escrow payments were due each month.  The loan history established that payments were applied to interest and escrow each month.  The court found this complied with Section 2 of the DOT.  Accordingly, no adjustment to the Claim was required.

The Riveras timely appealed on April 13, 2015.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B).  We explain our jurisdiction below.

When the Riveras filed their appeal, the Clerk issued an Order Re Finality on May 13, 2015, expressing concerns over whether the Claim Order was final.  While the Claim Order established the amount of the Claim, it also stated the amount was "subject to further determinations as to the disputed validity of the claim."  After briefing from the parties, the motions panel considered the notice of appeal as a motion for leave to appeal and granted leave to the extent necessary.

Subsequent to the appeal, the Riveras' chapter 13 case was dismissed.  Deutsche Bank moved to dismiss the appeal of the Claim Order as moot due to the dismissal.  The motions panel denied that request, ruling that the establishment of a claim amount is binding and conclusive on the parties and has a preclusive effect. Bevan v. Socal Commc'ns Sites (In re Bevan), 327 F.3d 994, 997 (9th Cir. 2003).  The parties were ordered to resume with briefing.

With the dismissal of the second adversary proceeding against Deutsche Bank, which was the only proceeding keeping the Claim Order from being final, it is clear that the Claim Order now is final, Eastport Assocs. v. City of L.A. (In re Eastport Assocs.),

-16-

935 F.2d 1071, 1075 (9th Cir. 1991), and the amount established in the Claim is binding between the parties and has preclusive effect in courts outside of the bankruptcy court. Therefore, we agree with the motions panel that the appeal is not moot, as we could grant the Riveras effective relief if we were to reverse. Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 880 (9th Cir. 2012). Accordingly, we have jurisdiction under 28 U.S.C. § 158(b).

### III. ISSUES

1.    Were the payment options provided in the Riveras' monthly home loan statements consistent with the terms of the Note and the DOT?

2.    Did the servicer properly apply the Riveras' payments in accordance with the terms of the DOT?

3.    Did the servicer advances to the Trust satisfy the mortgage debt and preclude Deutsche Bank from filing the Claim?

### IV. STANDARDS OF REVIEW

An order overruling a claim objection can raise legal issues, which we review de novo, as well as factual issues, which we review for clear error. Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal), 450 B.R. 897, 918 (9th Cir. BAP 2011). "De novo review is independent, with no deference given to the trial court's conclusion." Allen v. U.S. Bank, N.A. (In re Allen), 472 B.R. 559, 564 (9th Cir. BAP 2012). Factual findings are clearly erroneous if they are illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

-17-

**V. DISCUSSION**

**A. The Riveras failed to raise the issue of payment options before the bankruptcy court.**

The Riveras contend the payment options offered in their monthly home loan statements breached the terms of the Note and the DOT, because they were not consistent with the terms of those documents. They assert that the Note does not provide for "payment options," does not define "pick a pay," and makes no mention of a "minimum payment." Rather, Sections 3(B) and 3(C) of the Note define the initial monthly payment and establish that a new monthly payment will be recomputed annually. Thus, argue the Riveras, the servicer's monthly statements set up for option payments designed to be a partial payment resulting in negative amortization breached the terms of the Note and the DOT.

The Riveras did not raise this argument before the bankruptcy court. Generally, an issue raised for the first time on appeal is deemed waived. WildWest Inst. v. Bull, 547 F.3d 1162, 1172 (9th Cir. 2008). We have discretion, however, to consider a newly raised issue (1) in the "exceptional" case where review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process, (2) when a change in the law has occurred while the appeal was pending, or (3) when the issue is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed. Id. (citing Cold Mountain v. Garber, 375 F.3d 884, 991 (9th Cir. 2004)).

We decline to exercise our discretion here. This case is not "exceptional" where review is necessary to prevent a miscarriage

-18-

of justice, no change in the law has occurred, and the issue is not purely one of law and the factual record may not be fully developed. It is unknown what other documents the Riveras may have received with respect to the four payment options, if any.

**B. The servicer properly applied the Riveras' payments in accordance with the terms of the DOT.**

The Riveras contend that the misapplication of payments resulted in an improper increase in their principal balance. Specifically, they contend the servicer applied their payments in the priority of escrow and other charges first, then interest, then principal, when it should have applied the payments in accordance with the priority set forth in the DOT: interest first, then principal, then escrow. The bankruptcy court determined that the priority payment scheme utilized by the servicer was appropriate because no principal was "due on the Note" as contemplated in Section 2 of the DOT for the first five years. The evidence had established that the loan was a negative amortization loan. In contrast, escrow payments were "due on the Note" each month. We agree with the bankruptcy court.

Despite the Riveras' contention that principal was due during the relevant time period, it was not; their loan was an "interest-only" loan for the first five years. The Note and DOT do not require payments of principal until either (1) the principal balance increases to 125% of the amount borrowed, or (2) the fifth anniversary of the due date of the first payment. See Note Sections 4(H) & 4(I) and the Adjustable Rate Rider in the DOT Sections 4(H) & 4(I). Section 4(H) of the Note provides that if unpaid principal exceeds 125% of the principal amount originally

-19-

borrowed, then the new monthly payment will be in an amount which would be sufficient to repay the unpaid principal in full on the maturity date. Section 4(G) provides that for "each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad [sic] the difference to my unpaid Principal."

The terms of the Note and DOT provided that the Riveras could pay less than the full amount of interest that would need to be paid each month in order to repay the principal by the maturity date. Contrary to their argument, until the unpaid principal exceeded 125% of the amount originally borrowed, or until December 1, 2009, the Note did not require principal to be paid each month. Dyer's uncontroverted testimony that a full interest and principal payment was not due or required until the unpaid principal balance reached $550,000 or on year five is consistent with the terms of the Note and the DOT.

Although the Riveras could pay less than the full interest portion of their monthly payments, and principal payments were not yet due during the relevant time period, full escrow payments **were** "due on the Note" each month. Section 3 of the DOT required the Riveras to pay "Escrow Items" on the day their payments were due each month until the Note was paid in full. Section 4(F) of the Note provides that the payment cap for payment changes does "not apply to any escrow payments Lender may require under the Security Instrument." Moreover, Section 3 of the DOT provides that "Escrow Items" will be included in the monthly "Periodic Payments." Section 2 of the DOT, upon which the Riveras rely to argue that

-20-

the servicer applied their payments in the wrong order, provides that "payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument [including "Escrow Items" under Section 3], and then to reduce the principal balance of the Note."

Therefore, because only late charges, if any, the full escrow payment and a reduced interest payment were "due" each month under the terms of the Note and DOT for the first five years, the servicer did not misapply the Riveras' payments; the priority order of payment applied — late charges and escrow payments, then interest, then principal - did not violate the terms of the Note or the DOT. As the court stated in <u>Dunn v. GMAC Mortgage, LLC</u> in response to a similar payment priority argument plaintiffs raised there:

> The rules of contract interpretation require that Section 2 of the DOT be construed in a manner that allows Plaintiffs to perform their obligation to pay for Escrow Items under Section 3 of the DOT while still enjoying their right to pay only the minimum payment due under the Note. Plaintiffs' interpretation would lead to an absurd result in which no borrower payment could ever be applied to the Escrow Items despite the borrower's promise to pay for those items on a monthly basis throughout the loan term. It would also prevent Defendant from negatively amortizing the loan for unpaid interest until it first applied "all" of the payment it receives to interest due . . . . Additionally, Plaintiffs' interpretation would nonsensically require the lender to advance its own money to pay the Escrow Items, thereby lending the borrower additional sums — at no interest — with no additional security, and for the entire time any interest or principal remain owing and unpaid.

2011 WL 1230211, at *3 (E.D. Cal. Mar. 28, 2011).

Accordingly, the bankruptcy court did not err in determining that the servicer's method of applying the Riveras' payments did

-21-

not violate the terms of the DOT.[4]

**C.    The servicer's advances did not satisfy the Riveras' debt or affect their obligations under the Note.**

Under the PSA, a servicer's duties include collecting loan payments from the borrower and submitting the payments to the trust.  If the borrower stops making payments on the loan, the servicer is obligated to submit the delinquent payments; these payments are referred to as advances.  Once the Riveras defaulted, the servicer began advancing funds equal to the difference between minimum monthly required payments under the Note and the amount actually received.  Essentially, the servicer has been making advances to the Trust since the Riveras stopped paying in 2009.  By June 2013, the advance had grown to $90,714.70.  It is undisputed these advances were required by Section 4.02 of the PSA.

The Riveras argue that because Deutsche Bank received payments on the debt from the servicer, they are not in default.  Section 9 of the Note provides that "[a]ny person who takes over these obligations [within the Note], including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note."  The Riveras argue that when the servicer agreed under the PSA to pay advances on the Riveras' loan, the servicer "took over" the obligations under the

---

[4]    Riveras' argument that payments should be made to interest, then principal and then to escrow payments is without merit.  In the final application of payments, whether a payment is applied to principal or escrow payments, Riveras were properly charged interest on either category under the DOT at the note rate pursuant to sections 3 and 9.  Consequently, the calculations for the applied funds reflect identical amounts.

-22-

Note, including making payments. As a result, they contend that Deutsche Bank could not file the Claim to collect any arrearages for the servicer, which the Riveras contend is a third-party surety. The Riveras' arguments are flawed.

First, it is undisputed the Riveras, as borrowers, are not parties to the PSA. As neither parties nor beneficiaries of the PSA, they are unable to invoke its terms or benefits. Turner v. Wells Fargo Bank, N.A. (In re Turner), 2015 WL 3485876 at *9-10 (9th Cir. BAP June 2, 2015) (borrowers lack standing to enforce PSA terms because they are not parties to or third-party beneficiaries of the PSA); Casault v. Fed. Nat'l Mortg. Ass'n, 915 F. Supp. 2d 1113, 1135 (C.D. Cal. 2012). This interpretation is supported by Section 10.09 of the PSA, which states:

> Nothing in this Agreement or in any Certificate, expressed or implied, shall give to any Person, other than the parties hereto and their respective successors hereunder . . . any benefit or any legal or equitable right, remedy or claim under this Agreement.

Second, the Riveras incorrectly characterize the servicer advances as "payments" on their debt. Servicer advances are not "payments" made on behalf of or for the benefit of the borrower. Ouch v. Fed. Nat'l Mortg. Ass'n, 2013 WL 139765, at *3 (D. Mass. Jan. 10, 2013) (servicer advances would only be considered to be "on behalf of" the borrower if the servicers actually intended to extinguish the borrower's repayment obligations, citing 60 Am. Jur. 2d Payment § 1 (West 2012)); Casault, 915 F. Supp. 2d at 1136 (servicer advances are not payments made on borrower's behalf; borrower's loan is still in default); Schmeglar v. PHM Fin., Inc. (In re Schmeglar), 531 B.R. 735, 739 (Bankr. N.D. Ill. 2015) (rejecting same argument that servicer advances excused debtor

-23-

from making any mortgage payments that came due during the period of the advances).

Servicer advances are loans made to the trust in the amount of the borrower's unpaid monthly payment. In addition, under the PSA, the servicer is not required to make advances to cure a borrower's delinquency if the servicer determines it would be a "nonrecoverable advance."[5] See PSA §§ 4.02, 4.03. Finally, servicers under the PSA are authorized to liquidate and foreclose loans not paid by the borrower (see PSA § 3.09 at ER 591), which further undermines the Riveras' argument that the servicer has made Note payments "on their behalf" or that the servicer has "taken over" their repayment obligations. See Pulliam v. PennyMac Mortg. Inv. Trust Holding I LLC, 2014 WL 3784238, at *3 (D. Maine July 31, 2014) (rejecting borrower's same "surety" theory; servicer did not become surety for the note by entering into a contractual agreement under the trust to advance borrower's delinquent mortgage payments); Casault, 915 F. Supp. 2d. at 1136 (servicer did not "take over" the borrower's payment obligations by entering into the PSA); In re Schmeglar, 531 B.R. at 739 (because PSA authorized servicer to foreclose when debtor was in default of mortgage, the advances made by the servicer could not be seen as being made for the benefit of the debtor or on his behalf). Therefore, the Riveras are still in default on the Note due to their admitted failure to pay.

Lastly, the servicer is entitled to reimbursement of the

---

[5] Specifically, the servicer is only required to make advances to the extent they are anticipated to be recoverable from future payments, foreclosure proceeds, or other proceeds or collections. See PSA §§ 4.02, 4.03.

funds advanced.  See PSA §§ 3.05, 4.03.  Because the servicer's advances are reimbursable, the Riveras' debt to the Trust is not satisfied by those advances.  Casault, 915 F. Supp. 2d. at 1135; In re Schmeqlar, 531 B.R. at 739.  Hence, Deutsche Bank filed the Claim.

Accordingly, the bankruptcy court did not err in determining that the servicer's advances did not satisfy the debt, affect the Riveras' obligations under the Note or require any adjustment to the Claim amount.

**VI. CONCLUSION**

For the foregoing reasons, we AFFIRM the Claim Order.